THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NICHOLAS LOMMA, and J.L., a Minor,  :
by ANTHONY LOMMA, Guardian          :
                                     :
        Plaintiffs,                  :
                                     :        3:16-CV-2396          **FILED**
    v.                               :        (JUDGE MARIANI)      **SCRANTON**
                                     :
OHIO NATIONAL LIFE ASSURANCE         :                            SEP – 6 2017
CORPORATION, and OHIO NATIONAL       :
LIFE INSURANCE COMPANY,              :                            PER _____ΟΛΛ____
                                     :                               DEPUTY CLERK
        Defendants.                  :

## MEMORANDUM OPINION

Before the Court is Defendants', Ohio National Life Assurance Corporation and Ohio

National Life Insurance Company, ("Defendants"), motion to dismiss pursuant to Federal

Rule of Civil Procedure 12(b)(6). (Doc. 4). For the reasons that follow, Defendants' motion

will be granted in part and denied in part.

## I.    INTRODUCTION AND PROCEDURAL HISTORY

Plaintiffs Nicholas Lomma and J.L., a minor, by his guardian, Anthony Lomma,

("Plaintiffs"), seek to recover $100,000 as beneficiaries of a replacement term life insurance

policy issued by Defendants (the "Replacement Policy") on the life of their mother, Lora

Marie Lomma ("Ms. Lomma"). Ms. Lomma committed suicide in May of 2009 and

Defendants have denied payment of full death benefits based on a suicide exclusion in the

Replacement Policy.

Plaintiffs commenced this action on November 2, 2016, in the Court of Common Pleas of Lackawanna County. The complaint ("Complaint") asserts five causes of action: (1) breach of contract; (2) unjust enrichment; (3) promissory estoppel; (4) breach of implied covenant of good faith and fair dealing; and (5) statutory bad faith pursuant to 42 Pa. C.S.A. § 8371.[1]  (Doc. 1-4). Defendants removed the action to this Court on December 2, 2016, (Doc. 1), and promptly moved to dismiss the Complaint in its entirety on December 9, 2016. (Doc. 4).

## II.     FACTUAL ALLEGATIONS

Plaintiffs' Complaint and the exhibits attached thereto allege the following facts:

Plaintiffs, Nicholas Lomma and J.L., are or were minors residing in Scranton Pennsylvania and are the surviving children of Ms. Lomma. (Doc. 1-4, at ¶¶ 1-2). Anthony Lomma ("Mr. Lomma") is the natural parent of Nicholas Lomma and J.L and is the surviving former husband of Ms. Lomma and is also J.L.'s guardian. (Id. at ¶¶ 3-4). Defendants are Ohio corporations with registered addresses in Cincinnati, Ohio and are licensed to sell insurance in Pennsylvania. (Id. at ¶ 5).

---

[1] At the time Plaintiffs' Complaint was filed both Nicholas Lomma and J.L. were minors. On May 4, 2017, the parties stipulated to amend the caption to reflect that Nicholas Lomma "has reached the age of majority and is now a proper party in his own right." (Doc. 16, at 1). In addition, the Complaint named Ohio National Financial Services, Inc. as a defendant and noted that "Defendants Ohio National Life Assurance Corporation, Ohio National Life Insurance Company, and Ohio National Financial Services, Inc. are distinct legal entities. These companies are, however, closely related, and have acted in concert in regard to the claims made herein. Therefore, for the purpose of this Complaint, the companies will be referred to collectively." (Doc. 1-4 at 5 n.1). The parties have stipulated that "Ohio National Financial Services, Inc. is a holding company that owns Ohio National Life Insurance Company as a wholly owned subsidiary. Ohio National Financial., Inc. is not a party in the Policy, and thus is not a proper defendant." (Doc. 16 at 1).

In September 1986, Ms. Lomma applied for, and was issued, a life insurance policy (the "Original Policy") by Pennsylvania National Life Insurance Company with a coverage amount of $25,000. (*Id.* at ¶ 6). The Original Policy contained a suicide exclusion.[2] Although the facts surrounding Defendants' purchase of the Original Policy from Pennsylvania National Life Insurance Company are not entirely clear, Plaintiffs allege Defendants "purchased or otherwise acquired the Original Policy from Pennsylvania National Life Insurance Company." (*Id.* at ¶ 7).

On December 4, 1995, Ms. Lomma applied to increase the amount of coverage under the Original Policy from $25,000 to $100,000. (*Id.* at ¶ 8). In order to do so, she executed a "Request For Universal Life Policy Change" with Defendants. (Doc. 1-4 at 30-32). Ten days later Defendants informed Ms. Lomma that "[u]pon written request . . . the stated amount is hereby increased from $25,000 to $100,000 effective December 4, 1995." (*Id.* at 32). The Original Policy was set to expire on September 4, 2028.

Ms. Lomma filed an application for a new life insurance policy with Defendants with a coverage amount of $100,000 on June 6, 2007.[3] (Doc. 1-4 at 33-49). On the application, a box is checked indicating that the "proposed policy" would "replace or cause change in any

---

[2] Section 7.6 of the Original Policy provides: "[i]f, within two years from the Issue Date, the Insured, while sane or insane, commits suicide, our liability will be limited to a refund of the premium paid less any Policy Indebtedness and Partial Withdrawals." (Doc. 1-4 at 26).

[3] Plaintiffs allege that Ms. Lomma transferred the cash value of the Original Policy in order to the purchase of the Replacement Policy. (Doc. 1-4 at ¶ 11). As with the Original Policy, Ms. Lomma designated her sons, Nicholas Lomma and J.L., as the beneficiaries of the Replacement Policy. (*Id.* at ¶ 12).

existing policy." (Doc. 1-4 at 35). It identified the "existing policy" that the "proposed policy" would replace as "Ohio National," "Universal," "$100,000," and again a box is checked indicating that the existing policy will "be replaced." (*Id.*). Written on the application was that the "replacement date" would be "upon issue of this policy." (*Id.*)

On August 15, 2007, Defendants issued the Replacement Policy to Ms. Lomma with a benefit value of $100,000. (*Id.* at ¶ 13). Both the amount of insurance coverage and the beneficiaries are identical to those under the Original Policy.[4] (*Id.*). The Replacement Policy identifies the "Contract Date" as August 10, 2007, and the "Issue Date" as August 15, 2007. (Doc. 1-4 at 51). It also contains a definition of "Contract Months and Years," and states: "[t]his contract takes effect on the contract date shown on page 3. Contract months and years are marked from the contract date. The first day of the contract year is the contract date and its anniversaries." (*Id.* at 60).

The Replacement Policy, like the Original Policy, contains a suicide exclusion. The two exclusions, however, do not contain the same language. The suicide exclusion in the Replacement Policy provides:

> If the insured dies by suicide while sane or insane or by intentional self-destruction while insane, we will not pay any death proceed payable on amounts of insurance which have been in effect for less than 2 years. If the suicide or intentional self-

---

[4] The Original Policy was a policy for universal life insurance. "Universal life insurance has a cash value and typically permits the policyowner to change the death benefit and to decide how much premium to pay and when to pay, subject to lapse of coverage if payment is insufficient and subject to maximums imposed by the Internal Revenue Code, although fixed premium life insurance also exists." Franklin L. Best, Jr., *Life & Health Insurance Law*, § 3:1 (2d ed. 2017). "Term life insurance," which was provided for in the Replacement Policy, "lasts only for a limited term and has no cash value." (*Id.*).

> destruction is within the first 2 contract years, we will pay as death proceeds the
> premiums you paid.

(Doc. 1-4 at 62). Although the Replacement Policy defines the term "contract years," it does

not contain a definition for "amounts or insurance" and does not provide guidance for

determinations of whether those "amounts of insurance" have or have not "been in effect for

less than 2 years." (*Id.*).

Ms. Lomma committed suicide on May 24, 2009. (Doc. 1-4 at ¶ 15). At the time of

her death she had timely paid all premiums due under both the Original Policy and the

Replacement Policy and no premiums were due. (*Id.* at ¶ 26). Shortly after her death, Mr.

Lomma filed a claim for death benefits under the Replacement Policy on behalf of Nicholas

Lomma and J.L., requesting the $100,000 full death benefit. (*Id.* at ¶ 16). On August 31,

2009, Defendants' informed Mr. Lomma that they were denying the claim "on the grounds

that Ms. Lomma's suicide violated the provisions of the policy." (*Id.* at ¶ 17). Specifically,

Defendants wrote that "[b]ased on the information we have received and in accordance

with" the suicide exclusion in the Replacement Policy, "the death proceeds for death due to

'Suicide' within the first two contract years is a refund of premiums paid." (Doc. 1-4 at 69).

Enclosed with the letter were two checks each in the amount of $144.27 (totaling $288.54)

representing the premiums Ms. Lomma paid on the Replacement Policy plus 4.5% interest.

(*Id.*).

## III.     **STANDARD OF REVIEW**

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (internal citations and alterations omitted). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." (*Id.*) A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 231 n.14 (3d Cir. 2013) (internal citations and quotation marks omitted).

> *Twombly* and *Iqbal* require [a court] to take the following three steps to determine the sufficiency of a complaint: First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded

6

factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"Under Federal Rule of Civil Procedure 8, a complaint need not anticipate or overcome affirmative defenses; thus, a complaint does not fail to state a claim simply because it omits facts that would defeat" an affirmative defense. *Schmidt v. Skolas*, 770 F.3d 241, 248 (3d Cir. 2014) (citations omitted). "Technically, the Federal Rules of Civil Procedure require a defendant to plead an affirmative defense . . . in the answer, not in a motion to dismiss." (*Id.* at 249) (citing *Robinson v. Johnson*, 313 F.3d 128, 134-35 (3d Cir. 2002)). However, in limited circumstances an affirmative defense may properly be raised in a Rule 12(b)(6) motion to dismiss. But when the affirmative defense "is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Robinson*, 313 F.3d at 134-35 (internal citations and quotation marks omitted).

"To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted); *accord Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the

7

material that is pertinent to the motion." Fed. R. Civ. P. 12(d). "However, an exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *Schmidt*, 770 F.3d at 249 (internal citations and quotation marks omitted).

## IV.   **ANALYSIS**

Defendants move pursuant to Rule 12(b)(6) to dismiss each of the five counts alleged in Plaintiffs' Complaint. In resolving Defendants' motion, the Court considers the following exhibits attached to the Complaint: (1) the Original Policy; (2) Ms. Lomma's 1995 application with Defendants to increase coverage under the Original Policy from $25,000 to $100,000; (3) Ms. Lomma's application to obtain the Replacement Policy; (4) the Replacement Policy; and (5) Defendants' letter denying Plaintiffs' claim. (Doc. 1-4 at 12-69). Defendants also attach these documents to their motion to dismiss.[5] (Docs. 4-1 at 9-60; 4-2).

---

[5] Defendants also attach to their motion, and ask the Court to consider, a "Notice Regarding Replacement of Life Insurance and Annuities" (the "Notice"). (Doc. 4-4). The Notice, however, cannot be considered by the Court at this stage of the proceedings. Plaintiffs neither attached the Notice to the Complaint nor made any reference to the Notice in Complaint. Only documents which are "undisputedly authentic" and "integral to or explicitly relied upon in the complaint" may properly be considered on a Rule 12(b)(6) motion to dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal citations and quotation marks omitted). Although the Notice is relevant to Count I, and Plaintiffs do not dispute its authenticity in their brief in opposition to Defendants' motion, the Notice is not integral to Count I. Count I is based on Plaintiffs' allegations that Defendants breached the Replacement Policy by relying on the suicide exclusion to deny full death benefits. The definitions contained in the Replacement Policy include, among other things, that "[t]he entire contract is your application, this policy and any riders or endorsement attached." (Doc. 1-4 at 62). The Replacement Policy does not provide that the Notice is to be considered part of the "entire contract." (*Id.*) Accordingly, the Notice is not integral to Plaintiffs' Complaint, but is instead relevant to Defendants' *affirmative defenses*, and the Court may not consider it for purposes of this motion.

The Court has jurisdiction over this diversity action pursuant to 28 U.S.C. § 1332 because Plaintiffs are citizens of Pennsylvania and Defendants are citizens of Ohio and the amount in controversy is over $75,000. The parties, and the Court, agree that Pennsylvania law applies to this action. *See Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 434 (3d Cir. 2006) ("Under Pennsylvania choice-of-law rules, an insurance contract is governed by the law of the state in which the contract was made.") (citations omitted). The Court will address each Count in turn.

## A.     Breach of Contract

In Count I, Plaintiffs allege that Defendants breached the Replacement Policy by refusing to pay the full $100,000 death benefit upon Ms. Lomma's death. Defendants seek dismissal of Count I on the theory that the Replacement Policy's suicide exclusion unequivocally establishes that the $100,000 death benefit was not payable to Plaintiffs. In opposition to Defendants' motion. Plaintiffs raise two principal arguments. First, they claim the suicide exclusion is ambiguous and therefore must be construed against the Defendants. Second, Plaintiffs argue that the facts alleged in the Complaint and the totality of circumstances plausibly demonstrate that Ms. Lomma had a reasonable expectation of coverage. In either case, because Defendants are relying on affirmative defenses to defeat Count I, it is Plaintiffs' position that Defendants' Rule 12(b)(6) motion must be denied. Before addressing the parties' contentions, the Court will discuss Pennsylvania law governing the interpretation of insurance policies.

## 1.    Pennsylvania Law

"Insurance policies are contracts, and the rules of contract interpretation provide that the mutual intention of the parties at the time they formed the contract govern its interpretation." *Am. & Foreign Ins. Co. v. Jerry's Sports Ctr., Inc.*, 606 Pa. 584, 2 A.3d 526, 540 (2010) (citations omitted). "It is well-established that three elements are necessary to plead a cause of action for breach of contract:  (1) the existence of a contract, including its essential terms, (2) a breach of the contract, and (3) resultant damages."[6] *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firms of Malone Middleman, P.C.*, 635 Pa. 427, 137 A.3d 1247, 1258 (2016) (citations omitted).

"The interpretation of an insurance contract regarding the existence or non-existence of coverage is generally performed by the court." *Minnesota Fire & Cas. Co. v. Greenfield*, 579 Pa. 333, 344, 855 A.2d 854 (2004) (internal citations and quotation marks omitted).  In interpreting an insurance contract, the Court must "ascertain the intent of the parties as manifested by the terms used in the written insurance policy." *Donegal Mut. Ins. Co. v. Baumhammers*, 595 Pa. 147, 155, 938 A.2d 286 (2007) (citing *401 Fourth Street, Inc. v. Investors Ins. Grp.*, 583 Pa. 445, 454, 879 A.2d 166, 171 (2005)).  "[W]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone.  It speaks for itself and a meaning cannot be given to it other than that expressed." *Lesko v. Frankford Hosp.-Bucks Cnty.*, 609 Pa. 115, 15 A.3d 337, 342 (2011) (internal citations and

---

[6] Defendants neither dispute the existence of a contract nor do they allege Plaintiffs failed to plead damages.

quotation marks omitted); *see also Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 588 Pa. 470, 905 A.2d 462, 481 (2006) ("When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself.") (citations omitted).

If a term in an insurance policy is ambiguous, "parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances." *Insurance Adjustment Bureau*, 588 Pa. at 481 (citations omitted). "While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact." (*Id.*). When a provision in an insurance policy is ambiguous, courts applying Pennsylvania law must construe the language against the insurer. *See, e.g., West v. Lincoln Benefit Life Co.*, 509 F.3d 160, 169 (3d Cir. 2007) ("An unclear, ambiguous provision will be construed against the insurer and in favor of the insured."); *Baumhammers*, 595 Pa. at 155 ("However, when a provision in the policy is ambiguous, the policy is to be construed in favor of the insured . . . and against the insurer, as the insurer drafts the policy and controls coverage.") (internal citations and quotation marks omitted). "Pennsylvania's courts have long recognized that insurance contracts are not freely negotiated agreements entered into by parties of equal status." *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 905 (3d Cir. 1997) (internal citations and quotation marks omitted). "In recognition of the unique dynamics between insurer and insured, courts have attempted to favor the insured in a number of ways, including adapting the *contra*

*proferentem* principle of interpretation to the insurance context, by which ambiguities in policies are construed against the insurer." (*Id.*) (emphasis in original).

Under Pennsylvania law, "the insurer bears the burden of proving the applicability of any exclusions or limitations on coverage, since disclaiming coverage on the basis of an exclusion is an affirmative defense." *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1445 (3d Cir. 1996) (citations omitted); *see also Canal*, 435 F.3d at 436 ("Where an insurer relies on a policy exclusion as the basis for its denial of coverage and refusal to defend, the insurer has asserted an affirmative defense and, accordingly, bears the burden of proving such defense.") (internal citations and quotation marks omitted). "An exclusion in an insurance policy is a 'limitation of liability or carving out of certain types of loss to which the coverage or protection of the policy does not apply.'" *Borough of Moosic v. Darwin Nat'l Assurance Co.*, 556 F. App'x 92, 97 (3d Cir. 2014) (quoting 17 Williston on Contracts § 49:111 (4th ed.)). "Exclusionary clauses generally are strictly construed against the insurer and in favor of the insured." *Swarner v. Mut. Benefit Grp.*, 72 A.3d 641, 645 (Pa. Super. 2013) (citations omitted).

"[E]ven the most clearly written exclusion will not bind the insured where the insurer or its agent has created in the insured a reasonable expectation of coverage." *Moessner*, 121 F.3d at 903 (citations omitted). Pennsylvania law thus "dictates that the proper focus for determining issues of insurance coverage is the reasonable expectations of the insured." (*Id.*). "In most cases, the language of the insurance policy will provide the best indication of

the content of the parties' reasonable expectations." (*Id.* (internal citations and quotation marks omitted). "Courts, however, must examine 'the totality of the insurance transaction involved to ascertain the reasonable expectations of the insured.'" (*Id.*) (quoting *Dibble v. Sec. of Am. Life Ins. Co.*, 404 Pa. Super. 205, 590 A.2d 352, 354 (1991)).

### 2. Defendants' Motion Must Be Denied Because The Suicide Exclusion Is Ambiguous And, Even If The Suicide Exclusion Was Unambiguous, Plaintiffs Have Alleged Sufficient Facts Demonstrating That Ms. Lomma Had A Reasonable Expectation Of Coverage

The parties propose two different interpretations of the Replacement Policy's suicide exclusion. The suicide exclusion consists of two sentences. The first sentence provides: "[i]f the insured dies by suicide while sane or insane or by intentional self-destruction while insane, we will not pay any death proceed payable on amounts of insurance which have been in effect for less than 2 years." (Doc. 1-4 at 62). The second sentence, in turn, states: "[i]f the suicide or intentional self-destruction is within the first 2 contract years, we will pay as death proceeds the premiums you paid." (*Id.*).

Defendants principally rely on the second sentence of the suicide exclusion in support of their motion. They claim the second sentence is clear and unambiguous and unequivocally requires dismissal of Count I.The second sentence of the suicide exclusion provides that in the event the insured commits suicide within the first two contract years, as explicitly defined in the Replacement Policy, Defendants will not pay the full death benefits due under the Replacement Policy. Instead, Defendants will only pay death benefits representing the premiums paid by the insured.

13

The first sentence of the suicide exclusion is less clear. Unlike the term "contract years" in the second sentence, which is explicitly defined in the Replacement Policy, key terms in the first sentence of the suicide exclusion are not defined. The Replacement Policy neither defines "amounts of insurance" nor does it use a defined term like "contract years" to indicate whether those "amounts of insurance", which Defendants will not pay in the event of suicide, have or have not "been in effect for less than 2 years." (Id.). Plaintiffs thus take the position that the first sentence renders the entire suicide exclusion ambiguous and, under Pennsylvania law, ambiguities in an instance policy must be interpreted against the insurer. They also claim that, because Ms. Lomma maintained $100,000 in life insurance coverage with Defendants since 1995, she had a reasonable expectation of coverage because the suicide exclusion would not apply.

Defendants, in contrast, interpret the first sentence as applying "if a policyholder increased his or her death benefits from $100,000 to $500,000 during the 25th year of the policy and then committed suicide within the next two years." (Doc. 11, at 3). They also argue that Plaintiffs' interpretation of the suicide exclusion is untenable because it would effectively nullify the second sentence of the suicide exclusion. In support, Defendants direct the Court to the Pennsylvania Supreme Court's decision in *Capek v. Devito*, 564 Pa. 267, 767 A.2d 1047 (2001). With respect to Plaintiffs "reasonable expectations" argument, Defendants theorize that any expectation of coverage was unreasonable and that the Original Policy is entirely irrelevant to the issues in this case.

As an initial matter, the Court rejects Defendants' reliance on *Capek*. The argument that Plaintiffs' proposed interpretation would, in effect, render the second sentence of the suicide exclusion a nullity does not mean that Defendants' interpretation, therefore, must prevail. In *Capek,* an attorney brought suit against his former client seeking recovery of a contingency fee and the Court was called upon to interpret the parties' contract. The Pennsylvania Supreme Court noted that when construing a contract, courts "must determine the intent of the parties and give effect to all the provisions therein." *Capek*, 564 Pa. at 274. Accordingly, "[a]n interpretation will not be given to one part of the contract which will annul another part of it." (*Id.*) (internal citations and quotation marks omitted). *Capek*'s conclusion that a court may not interpret one part of a contract to annul another does not apply when a court interprets an insurance policy because, as discussed, Pennsylvania law requires any ambiguities in the policy to be interpreted against the insurer and in favor of the insured. *Moessner*, 121 F.3d at 903. Accordingly, the argument that Plaintiffs' proposed interpretation would in effect nullify the second sentence of the suicide exclusion does not in and of itself require dismissal of Count I at the pleading stage.

The Court must next look to Pennsylvania Supreme Court decisions interpreting suicide exclusions for guidance. When no case is directly on point, the court must predict how the Pennsylvania Supreme Court would rule. The parties do not cite to any Pennsylvania Supreme Court decision interpreting a suicide exclusion in an insurance policy. The Court, however, has located several cases where the Pennsylvania Supreme

Court considered cases where, as here, an insurer relied on a suicide exclusion to deny payments to the beneficiaries under an insurance policy.

In *Krebs v. Philadelphia Life Insurance Company*, 249 Pa. 330, 95 A. 91 (1915), the decedent submitted an application for life insurance dated July 19, 1913. Thereafter, he received a printed policy with an effective date of October 1, 1913. Written in ink on the third page of the policy was language providing for term coverage from August 1, 1913 to October 1, 1913. (*Id.* at 331). The policy contained a suicide exclusion which provided: "self-destruction while sane or insane, within one year of the date hereof, is a risk not assumed by the company under the policy." (*Id.* at 332). Another provision in the policy provided that "this policy shall be incontestable, except for nonpayment of premiums, after one year from its date." (*Id.*). The insured committed suicide on August 24, 1914 and the question before the Court was "whether or not the date of the policy is to be counted from the date of the printed form or from that of the written clause." (*Id.*). "If the former is accepted, the company is not liable; but, if the latter is adopted, then the required year had expired before the death of the insured, and the beneficiaries are entitled to recover." (*Id.*).

Although the printed language on the policy unambiguously provided that the policy date was October 1, 1913, the Pennsylvania Supreme Court held that the insured reasonably could have believed that the handwritten language, with a reference date of August 1, 1913, meant that the policy, with all in terms, was in force as of this date. In reaching this conclusion the Court noted:

It would have been an easy matter for the insurer to insert a provision to the effect that the date of the original policy should apply so far as the suicide clause was concerned, or that there was no exemption from suicide in the term policy. That was not done, and neither is there anything to show that a term policy meant something different from the contract, which was set forth in the printed form. The burden of showing this was on defendant, under the well-settled rule that, where there is an ambiguity in the conditions of a policy of insurance, its provisions will be construed *most strongly* against the insurer and in favor of the insured.

(*Id.* at 334-35) (emphasis added).

In 1935 the Pennsylvania Supreme Court again construed a suicide exclusion in a life insurance policy. *Ligouri v. Supreme Forest Woodmen Circle*, 318 Pa. 424, 178 A. 390 (1935). Here, the Court granted the insured's motion for a new trial and reversed the trial court's entry of judgment upon verdict in favor of the insurer. Specifically, the Supreme Court held that the trial court erred by failing to treat defendant's reliance on the suicide exclusion as an affirmative defense. "'When in a suit on a policy containing a provision avoiding the policy if the insured dies by his own hand, plaintiff makes out a prima facie case, and defendant seeks to avail itself of the substantive defense reserved in the policy that the loss was due to a cause or risk specifically excepted in the policy, the defense becomes an affirmative one and has the burden of proof.' This is exactly the situation in the case at bar." (*Id.* at 426) (quoting *Watkins v. Prudential Ins. Co.*, 315 Pa. 497, 508, 173 A. 644, 650 (1934).

In *Harty v. Standard Accident Insurance Company*, 394 Pa. 358, 147 A.2d 421 (1959), the Pennsylvania Supreme Court again interpreted a suicide exclusion. In this case, the plaintiff's husband purchased a policy in 1948 which he maintained by successive

17

renewals until March 31, 1954. "This policy contained a thirty-one days' grace period and required sixty days' notice to terminate it. There was no provision against suicide." (*Id.* at 359). On April 5, 1954, the decedent paid premiums on a new policy which, unlike the original policy, contained a suicide exclusion. The decedent committed suicide less than a month later.

The defendant denied plaintiff's claim for death benefits. Plaintiff brought suit for breach of contract and judgment was entered in favor of the plaintiff beneficiary upon the jury's verdict. On appeal, the defendant insurer claimed there was insufficient evidence to sustain the verdict and also claimed it was entitled to a new trial based on the judge's statement that the change in the policy "should be construed strictly against it and in favor of the insured." (*Id.* at 360). According to the defendants, "since the dispositive point is whether or not there was a substitution of one policy for another, there was no part of the policy requiring construction."

The Supreme Court rejected the defendant's argument, holding that where the defendant relies on the defense that the original policy was ineffective because it had been cancelled, it bore the burden to prove the cancellation was effective and "must show strict compliance with the cancellation provisions." (*Id.* at 361) (citations omitted). The Court further held that it was entirely appropriate for the trial judge to leave "the decedent's intention to the jury, and their verdict supplies the answer. It could not be declared as a matter of law." (*Id.* at 362).

The Pennsylvania Supreme Court has cited to *Harty* on just one occasion. *Issac v. Continental Cas. Co.*, 442 Pa. 480, 276 A.2d 299 (1971). In *Issac*, the plaintiff insured commenced an action against its insurer "seeking to recover on a sickness and accident indemnity policy." (*Id.* at 481). The insurance company "defended on the grounds that the [insured] had procured a second policy, and therefore, [he] had no right to recovery on the first policy." (*Id.*). The jury found in favor of the insurer and the Supreme Court affirmed the trial court's denial of the plaintiff's motion for a new trial and for judgment notwithstanding the verdict. Citing *Harty*, the Court concluded that the defendant presented sufficient evidence that the insured not only intended to, but did in fact, procure a policy substitute and consented or agreed that the substituted policy would replace the original policy. (*Id.* at 483).

*Krebs*, *Ligouri*, *Hartle*, and *Issac*, while useful to guide the court's interpretation of Pennsylvania law as applied to the facts of this case, are not entirely on point. None of these cases addresses the replacement of a universal life insurance policy with a term policy in circumstances where the insured maintained the same amount of coverage and the insurer was relying on a suicide exclusion that would not be effective in the original policy to deny coverage under the replacement policy. The suicide exclusions at issue in those cases also did not contain the same language found in the Replacement Policy at issue here. More recent decisions of the Pennsylvania Supreme Court in related areas have addressed exclusions in insurance policies, *supra* at 10-13, and are consistent with

*Krebs*, *Ligouri*, *Hartle*, and *Issac*. Specifically, these cases confirm that Pennsylvania law not only requires courts to interpret ambiguous policy exclusions against the insurer, but also provides that unambiguous exclusions may not operate to free the insurer from liability for breach of contract unless the insurer can prove the insured had no reasonable expectation of coverage based on the totality of the circumstances. "When there is no Pennsylvania Supreme Court decision directly on point, we are charged with predicting how it would resolve the question at issue." *Canal*, 435 F.3d at 436 (citations omitted). "In order to do so, we must take into consideration (1) what the Pennsylvania Supreme Court has said in related areas, (2) the decisional law of the Pennsylvania intermediate courts, (3) federal cases interpreting state law, and (4) decisions from other jurisdictions that have discussed the issue." (*Id.*) (citations omitted).

Plaintiffs do not direct the Court to any decisional law of the Pennsylvania intermediate appellate courts to support its positions. Defendants, however, cite to a 1936 Pennsylvania Supreme Court decision to support the proposition that the inclusion of a two year suicide exclusion in a life insurance policy is not against Pennsylvania public policy. *Longenberger v. Prudential Ins. Co. of Am.*, 121 Pa. Super. 225, 183 A. 422 (1936). While *Longenberger* no doubt supports that proposition, it is of little help to Defendants in this context. In *Longenberger*, the Superior Court affirmed the trial court's entry of judgment for the plaintiff beneficiary. The suicide exclusion in the life insurance policy was dated 1922 and provided "[i]f within one year from the date hereof the Insured shall die by suicide—

20

whether sane or insane—the liability of the Company shall not exceed the amounts of the premiums paid on this Policy." (*Id.*) The insured committed suicide well after the one year exclusionary and incontestability period. The Court held that the suicide exclusion was unambiguous and rejected the insurer's argument that Pennsylvania public policy does not permit the payment of death benefits where the insured commits suicide under any circumstances, regardless of the language of the exclusion.

In *Dibble* the plaintiff beneficiary and her deceased husband applied for mortgage life insurance in July, 1986. 404 Pa. Super. at 208. "The application for the insurance policy was completed and signed by the Dibbles on July 11, 1986." (*Id.*). The application stated that the policy would be effective on "the first of the month following approval . . . if the application is approved by the 20th of the Month." (*Id.*). However, if the application is approved after the 20th, "then the insurance will become effective on the first of the second month following approval." (*Id.*).

On August 11, 1986, the insurer accepted the insureds' premium payments and the Dibbles continued to make timely premium payments each month thereafter. The policy was formally approved on September 8, 1986. It included the same language found in the application regarding the effective date of the insurance, which the defendants claimed unambiguously was identified as October 1, 1986. The policy contained a suicide exclusion, providing:

> If an Insured Mortgagor, whether sane or insane, shall die by suicide while insured hereunder, it is the intent of the Company to pay only the amount of insurance, or

portion thereof, which has been in force for more than two years from its effective date. Any premium contributed by the Insured Mortgagor for any insurance benefit which is denied due to this limitation shall be returned by the Company.

*Id.* at 209. On September 28, 1988, "two years and forty-seven days after the first insurance premium was paid," Mr. Dibble committed suicide. The plaintiff sought, and was denied, full death benefits from the defendant insurer because Mr. Dibble committed suicide within two years of the policy's "effective date."

On these facts, the Superior Court affirmed the trial judge's grant of summary judgment to the plaintiff beneficiary and rejected the defendant's arguments. In doing so, the Court conceded that the language in the suicide exclusion was unambiguous. Despite the unambiguous language of the suicide exclusion, "[o]ur Supreme Court has indicated that the proper focus regarding issues of coverage under insurance contracts is the reasonable expectations of the insured." (*Id.* at 210) (citing *Tonkovic v. State Farm Mut. Auto. Ins. Co.,* 513 Pa. 445, 521 A.2d 920 (1987); *Collister v. Nationwide Life Ins. Co.,* 479 Pa. 579, 388 A.2d 1346 (1978)). Therefore, courts "must not focus on the language of the application and policy" in isolation but must look to "the dynamics of the transaction viewed in its entirety." (*Id.* at 211). Applying these principles to the facts of the case the Court concluded:

> In the instant situation, the Dibbles could have reasonably believed that when they paid the first premium on August 11, 1986, that the mortgage life insurance policy became effective at that time. By simply directing us to unambiguous language in the application and policy, Security of America has not established by clear and convincing evidence that the Dibbles were unreasonable in believing that coverage began upon their payment of the first premium. The *Collister* court held that only

after an *unequivocal showing that the consumer is to be given no immediate benefits in return for his premium prepayment*, can it be said that the insurer has sustained its burden. . . .

A review of the record reveals that Security of America made no effort to notify the Dibbles, beyond the notice printed on the application and policy, that they were making advance premium payments but getting nothing in return. According to *Collister*, such notice did not amount to an 'unequivocal showing' that the Dibbles were not receiving immediate benefits in return for their premium pre-payment.

(*Id.* at 212-13) (emphasis supplied).

Before *Dibble*, the Superior Court addressed whether a union's bylaws permitted the

denial of death benefits to a beneficiary of a deceased member who committed suicide.

*Steel v. Driver Salesmen's Union Local No. 463*, 147 Pa. Super. 172, 24 A.2d 20

(1942). The by-laws stated that the union would pay death benefits to a designated

beneficiary upon the death of a "member in good standing" and also provided that "[t]he

Executive Board of the Union shall be the sole judge in determining whether or not disability

or death is caused by intemperance, improper conduct or by disease contracted prior to

joining the Union." (*Id.* at 174). Affirming the trial court's denial of the defendant's motion

for judgment notwithstanding the verdict in plaintiffs favor, the Superior Court first looked to

the language of the by-laws, which contained "no qualification or limitation denying the right

of a beneficiary of a member, who died as a result of suicide, to collect death

benefits." (*Id.*). Under these circumstances, the court found "[i]t is reasonable to assume

that if the defendant had intended to exclude a beneficiary named in a certificate from

recovery in the event of a death of a member by self-destruction, it would have said so in

unmistakable language. That is the usual practice followed by those issuing certificates of policies of insurance; this was not done." (*Id.*) The Court, finding the bylaws ambiguous as applied, followed the "well-recognized rule that a by-law should be construed most strongly against the organization and in favor of the member; that it should not be interpreted to aid working a forfeiture." (*Id.* at 175) (citations omitted). That the defendant was a union, and not an insurance company, "makes no difference" because the "same general rules of construction apply." (*Id.*) Accordingly, "[t]he weight of authority supports the rule that in the absence of fraud in procuring life insurance with the intention of committing suicide, self-destruction, even by a sane person, will not defeat recovery unless the contracts so provide in express terms, provided third persons are beneficiaries." (*Id.* at 177) (citations omitted). Because the union's by-laws "contained no express provision prohibiting a recovery in event of suicide by a sane member, the plaintiff was entitled to a directed verdict." (*Id.*)

Federal courts applying Pennsylvania law have also interpreted suicide exclusions in insurance policies. For example, in *Oakes v. Franklin Life Insurance Company*, 516 F. Supp. 445 (E.D. Pa. 1981), the court considered whether a suicide exclusion in a life insurance policy was ambiguous. The policy at issue contained, under a heading "Payment of Benefits," the following provision:

> Suicide: If within 2 years from the date of issue the insured (whether sane or insane) shall die by suicide, this policy shall automatically terminate and the amount payable in lieu of all other benefits shall be limited to the premiums paid.

(*Id.* at 446).  The term "date of issue" was explicitly defined in the policy.  The "sole

question" before the court on cross-motions for summary judgment was "whether the date of

issue referred to in the suicide clause is the date of the issue on the policy, August 24,

1977, or the date on which the insured was given temporary or interim coverage, August 10,

1977." (*Id.*)

The plaintiff beneficiary took the position that the insurer provided temporary

coverage on the date of application because it accepted the decedent's premium payment

which the beneficiary alleged "created an ambiguity as to the date of issue." (*Id.*)  The court

did not find this argument persuasive, and granted the insurer's motion for summary

judgment, concluding:

> There is no ambiguity.  The suicide clause is tied clearly to the 'date of issue' which
> is the specific operative language.  The designation, 'Date of Issue,' is set out on the
> face of the contract of insurance under Policy Data and the date of August 24, 1977
> is typed in bold type next to the designation.  The date of issue corresponds with the
> commencement of the 'First Policy Year,' the 'Maturity Date,' and the 'Expiring Date'
> of the policy. The schedule of death benefits was premised on the policy year
> commencing August 24, 1977.  The annual premium due date likewise commenced
> August 24, 1977.  The first premium deposit was applied to the period commencing
> August 24. The incontestability date under the policy was the 'date of issue.'  In
> short, all operative dates within the policy, including the grace period, are tied to
> August 24, 1977.

(*Id.*)  Because the language of the policy and the suicide exclusion were unambiguous, the

court refused to apply *Collister*'s reasonable expectations doctrine because *Collister* "did not

involve a suicide but an accidental death" and "was only concerned with coverage during

the interim period between application and issuance of the policy and not with the terms of

the policy once issued or with its date of issue."[7]  (*Id.* at 447).

The Pennsylvania Superior Court, in *Dibble*, expressly rejected *Oakes* holding in this

respect.  Specifically, the Court found:

> Not only does the *Oakes* court ignore the reasonable expectations test set forth
> in *Collister*, it also purports to restrict *Collister's* application to cases 1) which involve
> accidental deaths; and 2) which involve issues of coverage during the interim period
> between application and issuance of the policy.  This is not what the *Collister* court
> intended, nor is it what Pennsylvania courts have consistently held since the decision
> was filed in 1977.

*Dibble*, 404 Pa. Super. at 214 (citations omitted).

Defendants' brief in support of their motion cites to a Third Circuit non-precedential

opinion in which the Circuit considered a suicide exclusion in a life insurance policy.  *Am.*

*Gen. Life Ins. Co. v. Shenkman*, 455 F. App'x 263 (3d Cir. 2011).  In *Shenkman*, the Third

Circuit affirmed the district court's entry of summary judgment in favor of the plaintiff insurer

on its declaratory judgment claim and against the trustees of the Shenkman Trust.  The

facts are as follows:  more than two years before the decedent committed suicide he

"initiated an exchange of his life insurance policy with General American Life Insurance

---

[7] Defendants also cite to *Blumenschein v. Sec. Connecticut Life Ins. Co.*, 586 F. Supp. 857 (W.D.
Pa. 1984), *aff'd* 755 F.2d 916.  In *Blumenschein,* the court considered the plaintiff/insured's "motions for
judgment notwithstanding the verdict and for new trial."  586 F. Supp. at 857.  At issue was a suicide
exclusion which provided:  "[i]n the event of suicide of the Insured, while sane or insane, within two years
from the Issue Date, the amount payable by the Company shall be limited to the amount of premium
paid." (*Id.* at 858).  Like Ms. Lomma, the decedent committed suicide just shy of two years following the
policy's effective date.  *Blumenschein* is readily distinguishable because in that case the plaintiff, unlike
Plaintiffs in this case, did not appear to claim that the suicide exclusion was ambiguous.  Rather, the
plaintiff took the position that the decedent did not commit suicide and also argued that the suicide
exclusion was against public policy.

Company for a new policy with American General Life Insurance Company (no affiliation) that provided greater coverage." (*Id.* at 263). The replacement policy's suicide exclusion provided:

> Suicide Exclusion: If the Insured takes his or her own life, while sane or insane, within 2 years from the Date of Issue, We will limit the Death Benefit Proceeds to the premiums paid less any policy loans and less any partial case surrenders paid

*Am. General Life Ins. Co. v. Shenkman*, Civil Action No. 09-3191, 2010 WL 2985803, at *1 (E.D. Pa. July 27, 2010), *aff'd* 455 F. App'x 263. The replacement policy expressly identified the Date of Issue as December 19, 2006. Elsewhere in the policy, however, was a definition for the Date of Issue which the district court found could reasonably be interpreted as either December 12, 2006 or December 19, 2006. Because the decedent committed suicide on November 13, 2008, however, the suicide exclusion unambiguously applied regardless of any ambiguity as to the Date of Issue and established that full death benefits were not payable to the defendants under either date. The district court also rejected the defendant/trustee's argument "that the insurer's conduct created a reasonable expectation the policy had actually issued on some earlier date." *Shenkman*, 455 F. App'x at 263-64.

In affirming the district court's order, the Third Circuit held that the unambiguous language of the replacement policy could not reasonably be interpreted "to have a date of issue other than the date of delivery, December 12, 2006, or the express date of issue, December 19, 2006." (*Id.* at 264). It further rejected the trustee's argument that the

"totality" of the circumstances showed that the insurer created a reasonable expectation of coverage from November 10, 2006, *i.e.*, "the date on which the insurer submitted its request for surrender of Shenkman's prior policy." (*Id.* at 265). After consideration of the circumstances surrounding the decedent's surrender of the prior policy and the plain language of the replacement policy, the Court held that the decedent's "expectation conflicts with the communications between the parties and the policy language." (*Id.* at 266).

What the Court finds particularly enlightening from its review of the case law on suicide exclusions is that not a single decision was resolved at the pleading stage. Defendants did not cite, and the Court was unable to locate, any decision applying Pennsylvania law that granted an insurer's motion to dismiss a breach of contract claim based on the application of a suicide exclusion. Although not in the context of suicide exclusions, *Bensalmen Township v. International Surplus Lines Insurance Company*, 38 F.3d 1303 (3d Cir. 1994), helps put Defendants' motion into proper context. In *Bensalem*, the plaintiff municipality contracted with the defendant insurer for professional liability insurance covering civil claims made against the municipality and its officials during the policy period. "The agreement included a typical exclusion clause that barred coverage of any claims arising from pre-policy litigation." (*Id.* at 1304). After the plaintiff renewed its policy, the insurer added new language expanding the scope of the exclusion clause. "The new exclusion limited coverage to claims completely unrelated to any prior matter, regardless of whether the matter involved litigation for money damages." (*Id.*) The

Township sought, and was denied, coverage. The defendants based its denial of coverage on the new exclusion clause. The Township brought suit against the insurer alleging breach of contract and the district court granted the insurer's Rule 12(b)(6) motion to dismiss, holding that the litigation for which the Township sought coverage fell squarely within the express terms of the policy's exclusion clause.

In reversing and remanding, the Third Circuit concluded that "the district court should not have dismissed the complaint without allowing discovery on the issue of whether the new language added to the insurance policy's prior litigation exclusion clause is inconsistent with Township's reasonable expectation of the type of coverage provided under the agreement." (*Id.* at 1308). Although the Township "may have known of the change in the language of the exclusion clause when it renewed the policy, it should nevertheless have the opportunity to discover and submit evidence that Insurers had created in it a reasonable expectation that the policy would cover claims such as that presented by the . . . litigation." (*Id.* at 1308-09).

The Court of Appeals thus rejected an argument by the insurer, which was identical to the argument advanced by Defendants in this case, that the plaintiff's breach of contract claim must be dismissed at the pleading stage because the language of the exclusion provision was clear and unambiguous and, as such, Pennsylvania does not permit the court to "consider what the parties' reasonable expectations might have been." (*Id.* at 1309). After reviewing Pennsylvania case law, the Court of Appeals noted "we are

Township sought, and was denied, coverage. The defendants based its denial of coverage on the new exclusion clause. The Township brought suit against the insurer alleging breach of contract and the district court granted the insurer's Rule 12(b)(6) motion to dismiss, holding that the litigation for which the Township sought coverage fell squarely within the express terms of the policy's exclusion clause.

In reversing and remanding, the Third Circuit concluded that "the district court should not have dismissed the complaint without allowing discovery on the issue of whether the new language added to the insurance policy's prior litigation exclusion clause is inconsistent with Township's reasonable expectation of the type of coverage provided under the agreement." (*Id.* at 1308). Although the Township "may have known of the change in the language of the exclusion clause when it renewed the policy, it should nevertheless have the opportunity to discover and submit evidence that Insurers had created in it a reasonable expectation that the policy would cover claims such as that presented by the . . . litigation." (*Id.* at 1308-09).

The Court of Appeals thus rejected an argument by the insurer, which was identical to the argument advanced by Defendants in this case, that the plaintiff's breach of contract claim must be dismissed at the pleading stage because the language of the exclusion provision was clear and unambiguous and, as such, Pennsylvania does not permit the court to "consider what the parties' reasonable expectations might have been." (*Id.* at 1309). After reviewing Pennsylvania case law, the Court of Appeals noted "we are

confident that where the insurer or its agents creates in the insured a reasonable

expectation of coverage that is not supported by the terms of the policy that expectation will

prevail over the language of the policy." (*Id.* at 1311). In reaching this conclusion the Court

of Appeals held:

> [W]e believe that Township could conceivably prove that it had a reasonable
> expectation of coverage despite policy language that appears to those not familiar
> with its relationship with Insurers unambiguously to preclude coverage, and that it
> therefore might be able to obtain coverage. We stress, however, that our holding
> must not be overstated. If Township was aware of the change in the exclusion
> provision before it elected to renew its policy with Insurers and Insurers made no
> representation that the scope of coverage would not be reduced, or if after Township
> agreed to renew Insurers informed Township of the change and its significance, then
> Insurers must prevail because, in our view, the policy unambiguously excludes
> coverage for claims such as the one at issue here.
>
> We are thus persuaded by the Township's argument that dismissal pursuant to Rule
> 12(b)(6) was inappropriate. Before the district court denied the motion to amend and
> dismissed Township's complaint for failure to state a claim, it should have allowed
> discovery to enable it to review the circumstances surrounding the insurance
> agreement in order to determine whether Township might have had a reasonable
> expectation of coverage in this situation despite the language in the policy. We will
> therefore reverse and remand so that the district court can take these additional
> steps.

(*Id.* at 1312).

Turning to the Defendants' motion to dismiss Count I, a review of Pennsylvania case

law on suicide exclusions and the decisions of courts in this Circuit applying Pennsylvania

law, make it abundantly clear that the Court cannot resolve Defendants' affirmative

defenses to Count I on a 12(b)(6) motion for at least two reasons. First, the suicide

exclusion were ambiguous. Because the suicide exclusion is ambiguous, Pennsylvania law

dictates that it must be interpreted against the Defendants. Second, even if the suicide exclusion is unambiguous, Plaintiffs plausibly allege that Ms. Lomma had a reasonable expectation of coverage based on the totality of the circumstances. In either case, Defendants' affirmative defenses based on the language of the suicide exclusion and course of dealing between the parties does not warrant dismissal of Count I.

The Court's review of the suicide exclusion shows it is ambiguous, both facially, and as applied to Plaintiffs. The suicide exclusion provides:

> If the insured dies by suicide while sane or insane or by intentional self-destruction while insane, we will not pay any death proceed payable on amounts of insurance which have been in effect for less than 2 years. If the suicide or intentional self-destruction is within the first 2 contract years, we will pay as death proceeds the premiums you paid.

(Doc. 1-4 at 62). "Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Canal*, 435 F.3d at 435 (internal citations and quotation marks omitted). Put another way, "contractual terms are ambiguous if they are subject to more than one reasonable interpretation *when applied to a particular set of facts*." *Madison Constr. Co. v Harleysville Mut. Ins. Co.*, 557 Pa. 595, 735 A.2d 100, 106 (1999) (citations omitted) (emphasis added).

Plaintiffs argue that the suicide exclusion is ambiguous because, not only are various terms undefined, but the wording of the first sentence suggests that Defendants would pay full death benefits on "amounts of insurance" which had been in effect with the Defendants for more than two years. It is reasonable, according to Plaintiffs, "to interpret the 2 year

suicide exclusion as beginning when Ms. Lomma first obtained $100,000.00 in coverage from Ohio National." (Doc. 10, at 2-3). The Court agrees. The language of the suicide exclusion, both in isolation and when considering the Replacement Policy as a whole, is capable of being understood in more than one sense and it is plausible that Defendants intended to pay full death benefits to Plaintiffs regardless of whether Ms. Lomma committed suicide within two contract years of the of the Replacement Policy because she consistently held $100,000 in life insurance through Defendants from 1995 through 2009. The first sentence of the suicide exclusion, unlike the second sentence, fails to reference the "contract year" or "effective date" but simply states that in the event insured commits suicide, the Defendants would not pay "amounts of insurance" that had been "in effect for less than 2 years."

Defendants do not appear to contest that Ms. Lomma was insured through them since 1995 in the amount of $100,000 and do not dispute she timely paid all premiums under the Original and Replacement Policies. Defendants, however, interpret the first sentence of the suicide exclusion as applying only to an existing policyholder who increases his or her amount of insurance and then commits suicide within two years of the contract date. While Defendants' interpretation presents another facially reasonable interpretation, even if the Defendants' interpretation may be the more reasonable one, this does not permit the Court to resolve this issue in Defendants' favor on their motion to dismiss.

That Defendants' interpretation cannot prevail over Plaintiffs' at this stage is highlighted by the Defendants' argument that the suicide exclusion in the Replacement Policy is a "standard" suicide exclusion used in the insurance industry. While suicide exclusions are no doubt "standard" in the insurance industry, a review of the case law shows that the language in the suicide exclusion, considered in the context of the Replacement Policy as a whole, is anything but a "standard" suicide exclusion. Many key dates necessary to both provide notice to Ms. Lomma and aid in the Court's interpretation are not referenced in the suicide exclusion. *See Meyer v. CUNA Mut. Ins. Soc'y*, 648 F.3d 154, 164 (3d Cir. 2011) (noting that a "typical" case of ambiguity in the contract is where "a technical term appearing in the policy is undefined within the policy"). The fact that the second sentence references the "contract year," which, in turn is defined in the Replacement Policy does not require dismissal. The Court cannot interpret the suicide exclusion in an evidentiary vacuum, and certainly cannot do so at the pleading state.

Defendants do not dispute that the first sentence of the suicide exclusion, unlike the second sentence, provides no metric from which to determine whether an "amount of insurance" has or has not been "in effect for two years." Instead, they claim the amount of insurance referenced in the first sentence applies only to amounts under the Replacement Policy and that Ms. Lomma could not reasonably believe otherwise. The Court thoroughly rejects this argument. Defendants' draftsmanship resulted in a suicide exclusion that is both

facially ambiguous and ambiguous as applied. [8]  A clearly worded and unambiguous suicide

exclusion referencing specifically defined terms, like the suicide exclusion courts in

Pennsylvania have been interpreting for over a hundred years and like the suicide exclusion

---

[8] Unlike every suicide exclusion the Court has reviewed, the first sentence of the suicide exclusion in the Replacement Policy neither defines nor bases its applicability on the "Date of Issue," the "Effective Date," or some expressly defined date in the policy.  Instead, it uses the terms "amounts of insurance" and in "effect for less than 2 years."  In addition, the suicide exclusion is found in a section of the Replacement Policy labeled "Claims," not "Exclusions," and is not expressly identified as a "Suicide Exclusion."  The Replacement Policy also neither contains sections nor paragraph numbers.  (Doc. 1-4 at 51-67).  These are but several items that make clear that the suicide exclusion in the Replacement Policy is ambiguous and not a "standard" suicide exclusion, as Defendants represent.  *Compare* (Doc. 1-4 at 62) ("If the insured dies by suicide while sane or insane or by intentional self-destruction while insane, we will not pay any death proceed payable on amounts of insurance which have been in effect for less than 2 years.  If the suicide or intentional self-destruction is within the first 2 contract years, we will pay as death proceeds the premiums you paid."), *with Crawford v. First Colony Life Ins. Co.*, 309 F. App'x 506, 508 (2d Cir. 2009) ("If the Insured while sane or insane, dies by suicide within two years after the Date of Issue shown in the Schedule, the death proceeds under this Policy will be an amount equal to the premiums paid less the loan balances as the date of his death."); *McKinnon v. Lincoln Benefit Life Co.*, 162 F. App'x 223, 225 (4th Cir. 2006) ("If the insured dies by suicide while sane or self-destruction while insane within two years of the issue date, we will not pay the death benefit.  We will return to you all premiums paid."); *Lotman v. Sec. Mutual Life Ins. Co. of New York*, 478 F.2d 868, 871 (3d Cir. 1973) ("If the death of the Insured shall result from suicide within two years from the Issue Date, the liability of the Company under this policy shall be limited to the amount of premiums paid less any dividends paid in cash or used in reduction of premium and less any indebtedness to the Company under the policy."); *Collins v. Unum Life Ins. Co. of Am.*, 185 F. Supp. 3d 860, 863 (E.D. Va. 2016) ("Your plan does not cover any losses where death is caused by, contributed to by, or results from – suicide occurring within 24 months after your or your dependent's initial effective date of insurance; and – suicide occurring within 24 months after the date any increases or additional insurance becomes effective for you and your dependent.  The suicide exclusion will apply to any amounts of insurance for which you pay all or part of the premium."); *Partridge v. USAA Life Ins. Co.*, Civil Action No. 14-cv-170-JL, 2015 WL 1268193, at *3 (D.N.H. Mar. 19, 2015) ("If the insured dies by suicide, while sane or insane, within 2 years from the Effective Date of the policy or from the effective date of the last reinstatement, if any, we will pay a reduced death benefit equal to . . . the premiums paid for benefits of the insured's life."); *Tran v. Transamerica Life Ins. Co.*, Civil Action No. 5:10-436-JMH, 2011 WL 2020564, at *1 (E.D. Ky. May 24, 2011) ("If the Insured Dies by suicide, while sane or insane, within two years from the date of issue, we will be liable only for the amount of premiums paid."); *Shenkman*, 2010 WL 2985803 at *1 ("Suicide Exclusion.  If the Insured takes his or her own life, while sane or insane, within 2 years from the Date of Issue, We will limit the Death Benefit Proceeds to the premiums paid less any policy loans and less any partial cash surrenders paid."), *aff'd* 255 F. App'x at 264; *Oakes*, 516 F. Supp. at 446 ("If within 2 years from the date of issue the insured (whether sane or insane) shall die by suicide, this policy shall automatically terminate and the amount payable in lieu of all other benefits shall be limited to the premiums paid.").

in the Original Policy, could easily have been inserted into the Replacement Policy. But it was not.

"The goal of interpreting an insurance policy, like that of any other contract, is to determine the intent of the parties." *Meyer*, 648 F.3d at 163. Where an exclusion in an insurance policy is ambiguous, Pennsylvania law requires it must be "strictly construed against the insurer and in favor of the insured." *Swarner*, 72 A.3d at 645 . As Plaintiffs cogently argue, the suicide exclusion clause "does not base the timing of the exclusion on the policy issue date, or the date of application, but on when the insured secured the amount of coverage. If Ohio National intended to use the policy date to time the exclusion, it could easily have done so. Ohio National chose to use the date on which the insured obtained an amount of coverage; this was clearly its intention." (Doc. 10, at 6). Because the suicide exclusion and the Replacement Policy are not "clear and unambiguous" the Court is unable to ascertain the intent of the parties "from the document itself." *Insurance Adjustment Bureau*, 688 Pa. at 481 (citations omitted). Plaintiffs plausibly allege facts suggesting that the parties intended for the suicide exclusion not to apply to the $100,000 death benefit and the ambiguous language of the suicide exclusion reasonably supports this interpretation. Defendants' interpretation is also reasonable and, even if it were the more reasonable interpretation, this is of no moment because "[a]n unclear, ambiguous provision will be construed against the insurer and in favor of the insured." *West*, 509 F.3d at 169.

Second, even if the suicide exclusion is unambiguous, dismissal at the pleading stage would still be unwarranted. "[E]ven the most clearly written exclusion will not bind the insured where the insurer or his agent has created in the insured a reasonable expectation of coverage." *Moessner*, 121 F.3d at 903 (citations omitted). "Courts must examine the dynamics of the insurance transaction to ascertain what are the reasonable expectations of the consumer," *Tonkovic*, 513 Pa. at 456, and "should be concerned with assuring that the insurance purchasing public's reasonable expectations are fulfilled." *Collister*, 479 Pa. at 594. "Thus, regardless of the ambiguity, or lack thereof, inherent in a given set of insurance documents (whether they be applications, conditional receipts, riders, policies, or whatever), the public has a right to expect they will receive something of comparable value in return for the premium paid." (Id.). "When an insurer creates a reasonable expectation of coverage that is not supported by the terms of a renewal policy, the reasonable expectations of the insured will prevail."[9] *Reliance Insurance*, 2000 WL 217511, at *8 (citations omitted).

Defendants do not cite to a single case where a Court granted an insurer's Rule 12(b)(6) motion to dismiss a breach of contract claim based on the application of an exclusion provision in any insurance policy, let alone a suicide exclusion in a replacement life insurance policy where various key terms are undefined. Instead, Defendants cite cases

---

[9] Because of the difficulty inherent in showing the reasonable expectations of the deceased insured (other than with reference to the language of the policy and the parties' written communications) "Pennsylvania courts appear to have allowed the beneficiary's expectations to inform the court's decision on what the insured expected." *West*, 509 F.3d at 171 n.5 (citing *Bierer v. Nationwide Ins. Co.*, 314 Pa. Super. 397, 461 A.2d 216 (1983)).

exclusion provision in a replacement life insurance policy precluded payment of full death benefits. And the Court can conceive of no circumstances where Rule 12(b)(6) permits dismissal of a breach of contract claim, where, as here, the beneficiaries plausibly allege that the insured and insurer had a pre-existing contractual relationship and the insurer is relying on an exclusion in a replacement life insurance policy to deny benefits that plaintiffs allege the insurer would be obligated to pay under the original policy.

In sum, Defendants have not satisfied their burden to show that on the face of the Complaint and the documents attached thereto that any of its affirmative defenses will be obviously be successful.[10] The language of the suicide exclusion in the Replacement Policy

---

[10] The language of the Notice, Replacement Policy, and the Original Policy, among other things, will no doubt be relevant to the factfinder's determination of whether Ms. Lomma did or did not have a reasonable expectation of coverage. *See Reliance Insurance*, 2000 WL 217511, at * 9-10 (insured's reasonable expectations "must be examined both in light of the Original Policy and the Renewal Policy" including "the grant of such coverage in the Original Policy"). Defendants' argument that the Notice is dispositive because it is a form notice set forth in the Pennsylvania Code governing the replacement of life insurance policies and clearly informed Ms. Lomma that replacing the Original Policy with the Replacement Policy is misplaced. Plaintiffs take the position that the language of the Notice cannot affect the language of the suicide exclusion and that "an insured in Ms. Lomma's position could read the Notice and conclude that while some time computations may be affected, the suicide exclusion in her policy would not be, as she had maintained the same coverage since 1995." (Doc. 10, at 4). Plaintiffs might also argue that the Notice was inadequate because the Defendants, as both the existing and replacement insurer, were in a position to inform Ms. Lomma that replacing the Original Policy with the Replacement Policy would in fact affect the suicide exclusion (not, as the Notice states, *may* affect her coverage). The Notice merely is evidence to support Defendants' affirmative defense that Ms. Lomma had no reasonable expectation of coverage based on the totality of the circumstances. Juries, not courts resolving a Rule 12(b)(6) motion, are often tasked with resolving these issues. *See Tonkovic*, 513 Pa. at 449 (affirming trial court's entry of judgment for insured on jury verdict); *see also Allstate Ins. Co. v. Hrin*, Civil Action No. 05-158, 2006 WL 2540778 (E.D. Pa. Aug. 31, 2006) (denying insurer's motion for post-trial relief after jury verdict in favor of insured based on insured's reasonable expectation of coverage); *Murphy v. Coregis Ins. Co.*, No. CIV. A. 98 CV 5065, 1999 WL 627910, at *10 (E.D. Pa. Aug. 17, 1999) ("Viewing the facts in the light most favorable to the plaintiffs, and viewing insurance transactions between the parties in their totality, the Court finds that a genuine issue of material fact has been created regarding plaintiffs' reasonable expectation of coverage.").

where courts granted Rule 12(b)(6) motions based on the statute of limitations or qualified immunity. (Doc. 11, at 3 n.3). Only where it is "apparent on the face of the complaint" or other documents properly considered on a motion to dismiss, can an affirmative defense "afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Robinson*, 313 F.3d at 134-35 (internal citations and quotation marks omitted). Put another way, granting a Rule 12(b)(6) motion to dismiss based on an affirmative defense "is appropriately considered only if it presents an insuperable barrier to recovery by the plaintiff." *Flight Sys., Inc. v. Elec. Data Sys. Corp.*, 112 F.3d 124, 127 (3d Cir. 1997) (citations omitted).

It is not a mere coincidence that no case Defendants rely on to support their interpretation of the suicide exclusion was resolved at the pleading stage. Rather, it is entirely consistent with the Court's review of case law interpreting suicide exclusions in insurance policies. The Court was unable to locate a single case where a federal court applying Pennsylvania law in a dispute over the applicability of a suicide exclusion in an insurance policy granted (or considered) an insurer's 12(b)(6) motion to dismiss. Defendants will bear the burden to prove that Ms. Lomma had no reasonable expectation of coverage. They may satisfy that burden only after consideration of the totality of circumstances. In most cases, this will be an issue to be resolved by the factfinder. Only in the rarest of circumstances, if at all, is it appropriate for a federal court applying Pennsylvania law to grant an insurer's Rule 12(b)(6) motion to dismiss an insured's breach of contract claim where the insurer's sole argument in support of dismissal is that a suicide

is ambiguous and, even if it could be considered unambiguous, Plaintiffs allege sufficient facts plausibly establishing a reasonable expectation of coverage. Defendants' motion to dismiss Count I, therefore, will be denied.[11]

## B.     Unjust Enrichment And Promissory Estoppel

In Counts II and III of the Complaint Plaintiffs brings claims for unjust enrichment and promissory estoppel under Pennsylvania law. Defendants seek dismissal of Counts II and III on the theory that Pennsylvania law forbids both causes of action where, as here, the relationship between the parties is governed by an express contract. (Doc. 4 at ¶¶ 15-19). Plaintiffs do not dispute that they "may not recover on the equitable claims of unjust enrichment and promissory estoppel where an express contract exists." (Doc. 10, at 8). They claim, however, it is permissible to plead, in the alternative, claims for unjust enrichment and promissory estoppel. Specifically, Plaintiffs allege:

> Here, there has been no stipulation, verified pleading, or other statement by the Defendants admitting the existence and validity of the contract. Nothing would prevent Defendants from disputing the contract's validity in their Answer. Plaintiffs

---

[11] The Court need not, at this stage of the proceedings, predict whether the Pennsylvania Supreme Court would require Defendants to prove that Ms. Lomma had no reasonable expectation of coverage by clear and convincing evidence or by a preponderance of the evidence. Pennsylvania law, as decided by the Pennsylvania Supreme Court and predicted by courts in this Circuit, is not consistent on this issue. See, e.g.,West, 509 F.3d at 171 ("In the reasonable expectation analysis, the insurer must demonstrate that the insured did not have a reasonable expectation of coverage. . . . Although Collister requires this showing by clear and convincing evidence, Tonkovic expressly approved a jury charge instructing that the insurer must show a mere preponderance. Because it is the heavier burden, we will proceed under the Collister evidentiary standard."); Horace Mann Ins. Co. v. Aben, No. 08-cv-0353, 2008 WL 4238940, at *9-10 (W.D. Pa. Sept. 10, 2008) (insurer failed to meet burden at summary judgment to "prove by clear and convincing evidence that the insured did not have a reasonable expectation of coverage"); Reliance Insurance, 2000 WL 217511 at *9 ("The insurer has the burden to prove by a preponderance of the evidence that the insured was aware of and understood an exclusionary clause in a renewal policy.") (citing Bensalem, 38 F.3d at 1311).

do not ask nor expect to recover under these alternative theories, as they are inconsistent. But at this stage of litigation, they can coexist. This rule is consistent with preventing piecemeal litigation—if no valid contract is found, a party can proceed via equity claims rather than filing a new case. Accordingly, Defendants' motion to dismiss must be denied.

(*Id.*). To support this proposition, Plaintiffs direct the Court to *Alpart v. General Land Partners, Inc.*, 574 F. Supp. 2d 491 (E.D. Pa. 2008).

"To plead unjust enrichment, a plaintiff must allege that: (1) the plaintiff conferred benefits upon the defendant; (2) the defendant appreciated and accepted such benefits; and (3) it would be inequitable for the defendant to retain the benefit without payment of the value." (*Id.* at 507) (citing *Wiernik v. PHH U.S. Mortg. Corp.*, 736 A.2d 616, 622 (Pa. Super. 1999). "A plaintiff cannot recover for unjust enrichment when an express contract governs the relationship between the parties." (*Id.*) (citations omitted). "An express contract is one where the parties specifically express the terms of the agreement, either orally or in writing." (*Id.*) (internal citations and quotation marks omitted).

In order to maintain a cause of action for promissory estoppel, Plaintiffs must show that "1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) justice can be avoided only be enforcing the promise." *Crouse v. Cyclops Indus.*, 560 Pa. 394, 403, 745 A.2d 606 (2000). Similar to a claim for unjust enrichment, a cause of action for promissory estoppel is equitable in nature and appropriate only "[w]here there is no enforceable agreement

between the parties." (*Id.* at 402); *see also Carlson v. Arnot-Ogden Mem'l Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990) (where "the parties formed an enforceable contract, relief under a promissory estoppel claim is unwarranted" under Pennsylvania law).

The Court agrees with the Defendants that Plaintiffs' reliance on *Alpart* is misplaced, and that Counts II and III of the Complaint must be dismissed. In *Alpart*, three individuals entered into an oral partnership agreement to acquire and develop a parcel of land. The parties also entered into a written agreement establishing a limited partnership. The Court granted in part and denied in part that defendants' motion to dismiss the unjust enrichment claim. Specifically, the court granted the motion with respect to a cause of action for unjust enrichment arising out of the express written contract, but denied it with respect to the alleged oral contract. Judge Brody's decision was informed by the fact that it had yet to be determined whether the contract was, in fact, a contract. *Alpart*, 574 F. Supp. 2d at 507. In so holding, she recognized that "[b]ecause the Federal Rules of Civil Procedure enable the plaintiffs to plead in the alternative, a claim for breach of contract and unjust enrichment can coexist at this early stage of litigation." (*Id.*).

*Alpart* does not apply to the facts of this case.[12] Plaintiffs' Complaint alleges the existence of an express written contract between Ms. Lomma and the Defendants do not deny that the Replacement Policy "is a valid, written, enforceable contract." (Doc. 11, at 4). Because it is undisputed that the relationship between the parties is governed by an

_____

[12] The facts alleged by Plaintiffs also show that Defendants returned (rather than kept) all premiums paid by Ms. Lomma on the Replacement Policy plus interest.

express written contract, Plaintiffs' claims for unjust enrichment and promissory estoppel must necessarily fail.[13] Defendants' motion to dismiss Counts II and III of the Complaint will be granted.

### C.    Breach of Implied Covenant Of Good Faith And Fair Dealing

Defendants also move to dismiss Count IV of the Complaint in which Plaintiffs allege they breached the implied covenant of good faith and fair dealing.  Specifically, Plaintiffs claim that Defendants "breached the implied covenant of good faith and fair dealing by denying payment of the benefit amount in clear violation of the plain language" of the Replacement Policy.  (Doc. 1-4 at ¶ 44).  Defendants evade the issue of whether Pennsylvania law implies such a duty, but instead argue that even if an implied covenant of good faith and fair dealing exists in the Replacement Policy, Count IV must nevertheless be dismissed because Count IV "is subsumed by the breach of contract claim."  (Doc. 4, at 4). Plaintiffs do not dispute that a first party cause of action in which the insured alleges breach of the implied covenant of good faith and fair dealing would be subsumed by the insured's

---

[13] To the extent Plaintiffs argue that Counts II and III should not be dismissed because Defendants may later deny the existence of an express written contract, the Court disagrees.  Defendants, like Plaintiffs, repeatedly represent that an express written contract exists between the parties.  Should Defendants somehow later claim that no express contract existed, they would likely be judicially estopped from taking that position.  "Judicial estoppel generally prevents a party from prevailing in one phase of the case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 222 n.8, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000) (citations omitted).  Three "threshold requirements" are necessary for judicial estoppel to apply: "first, the party in question must have adopted irreconcilably inconsistent positions; second, the party must have adopted these positions in bad faith; and third, there must be a showing that judicial estoppel is narrowly tailored to address the harm and that no lesser sanction would be sufficient." *Chao v. Roy's Constr., Inc.*, 517 F.3d 180, 186 n.5 (3d Cir. 2008) (citations omitted).  In the unlikely event that Defendants seek dismissal of Count I on the theory that no valid and enforceable contract existed between the parties, Plaintiffs may appropriately move to preclude Defendants from taking this position pursuant to the doctrine of judicial estoppel.

breach of contract claim. They nevertheless argue that because they are pursuing Count IV as third party beneficiaries, their claims are separate and distinct, and cannot be subsumed by the breach of contract claim. (Doc. 10, at 8-9). Plaintiffs do not cite any case law to support this proposition.

"The covenant of good faith and fair dealing involves an implied duty to bring about a condition or to exercise discretion in a reasonable way." *USX Corp. v. Prime Leasing Inc.*, 988 F.2d 433, 438 (3d Cir. 1993) (quotation marks, alterations and emphasis omitted). As such, "[c]ourts have utilized the good faith duty as an interpretive tool to determine the parties' justifiable expectations in the context of a breach of contract action." *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91 (3d Cir. 2000). "Examples of bad faith can include 'evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.'" *Benchmark Grp., Inc. v. Penn Tank Lines, Inc.*, 612 F. Supp. 2d 562, 583 (E.D. Pa. 2009) (quoting *Somers v. Somers*, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992)).

In Pennsylvania, "a duty of good faith and fair dealing is implicit in an insurance contract." *Smith v. Allstate Ins. Co.*, 904 F. Supp. 2d 515, 521 (W.D. Pa. 2012) (internal citations and quotation marks omitted). However, "a claim for breach of the implied covenant of good faith and fair dealing is a breach of contract action, not an independent action for breach of a duty of good faith and fair dealing." *Cummings v. Allstate Ins. Co.*,

832 F. Supp. 2d 469, 473 (E.D. Pa. 2011) (citing *LSI Title Agency, Inc. v. Evaluation Servs., Inc.*, 951 A.2d 384 (Pa. Super. Ct. 2008)). Thus, "Pennsylvania law does not recognize a separate breach of contractual duty of good faith and fair dealing where said claim is subsumed by a separately pled breach of contract claim." *Simmons v. Nationwide Mut. Fire Ins. Co.*, 788 F. Supp. 2d 404, 409 (W.D. Pa. 2011).

Nothing in the case law, however, bars a plaintiff from bringing a cause of action for breach of contract and a cause of action for breach of the duty of good faith and fair dealing when those two actions are based on separate conduct. *See Clunie-Haskins v. State Farm Fire & Cas. Co.*, 855 F. Supp. 2d 380, 388 (E.D. Pa. 2012) ("Here, however, the conduct forming the basis of Plaintiffs' breach of contract claim—the failure to defend or indemnify—is not the same conduct as their claim for breach of the duty of good faith and fair dealing . . . Consequently, Plaintiffs' two claims do not merge."). Instead, because a good faith and fair dealing claim is a breach of contract claim, Pennsylvania law simply bars a plaintiff from bringing both a breach of contract claim and a bad faith claim based on the same conduct. *See King of Prussia Equip. Corp. v. Power Curbers, Inc.*, 158 F. Supp. 2d 463, 467 (E.D. Pa. 2001) ("Because the actions forming the basis of [the plaintiff's] breach of contract claim and its good faith and fair dealing claim are essentially the same, [the plaintiff] cannot pursue both causes of action."); *Smith*, 904 F. Supp. 2d at 522 (noting that "claims for breach of the contractual duty of good faith and fair dealing have been dismissed where Plaintiff also asserts a claim for breach of contract and Plaintiff's claim for breach of the duty

44

of good faith and fair dealing is redundant."). Similarly, a party cannot bring a bad faith claim when the acts or omissions underlying the claim can be brought under another established cause of action. *See Northview Motors, Inc.*, 227 F.3d at 91-92.

In paragraph 36 of the Plaintiffs' Complaint, they allege that "Ohio Life promised Ms. Lomma to pay the benefit amount of $100,000 upon her death in exchange for the payment of premiums." (Doc. 1-4, at 6).

Plaintiffs further allege that it was "reasonable for Ms. Lomma to rely on this promise," (*Id.* at ¶ 37), and that "in reliance on this promise, Ms. Lomma made substantial premium payments to Ohio Life throughout the duration of the policies." (*Id.* at ¶ 38).

These allegations were preceded with Plaintiffs' allegation in paragraph 28 of their Complaint that "[t]he amount of coverage was $100,000 at the time of Ms. Lomma's death. This amount of coverage had been in effect since December 4, 1995, over thirteen (13) years prior to her death."

Each of these allegations were incorporated by reference in Count IV for breach of the implied covenant of good faith and fair dealing. Plaintiffs then allege that the implied covenant of good faith and fair dealing was breached by Ohio Life when it "denied payment of the benefit amount in clear violation of the plain language of the Second Policy." (*Id.* at ¶ 44). From these spare, but pointed allegations, it cannot be said that the Plaintiffs' cause of action for breach of the covenant of good faith in fair dealing is based on the same conduct which forms Plaintiffs' claim for breach of contract with respect to the express provisions of

the policy itself. Therefore, the Court will not dismiss Plaintiffs' claim for breach of the covenant of fair dealing at the pleading stage in that the law stated above herein makes clear that a plaintiff is not barred from bringing a cause of action for breach of contract and a cause of action for breach of the duty of good faith and fair dealing when those two actions are based on separate conduct. Accordingly, the Defendants' motion to dismiss Count III will be denied.

### D.      Statutory Bad Faith

Finally, Defendants seek dismissal of Count V of the Complaint (which Plaintiffs incorrectly label as Count IV). In Count V, Plaintiffs allege Defendants violated Pennsylvania's bad faith statute, 42 Pa. C.S.A. § 8371, "by denying payment of the benefit amount in clear violation of the plain language" of the Replacement Policy. According to Plaintiffs, the "clear violation" is based on the first sentence of the suicide exclusion "which states that, in the event of suicide," the Defendants "would pay 'amounts of insurance' which had been in effect for two years or more. (Doc. 1-4, at ¶ 48). Because Ms. Lomma maintained $100,000 in coverage with Defendants since 1995, Plaintiffs allege that Defendants' "stated reason for the denial is manifestly unreasonable, and constitutes a frivolous and unfounded refusal to pay because it is directly contradicted by the language of the policy." (*Id.* at ¶ 49). Plaintiffs further allege that Defendants knew, or should have known, that their "refusal to pay was unreasonable, frivolous and unfounded." (*Id.* at ¶ 50).

Defendants seek dismissal of Count V on the theory that their "determination that the beneficiaries of the policy at issue were only entitled to the premiums paid was based on the second sentence of the suicide exclusion." (Doc. 4, at ¶ 29). They further note that "[m]ore fundamentally, Plaintiffs' allegations that [Defendants] acted knowingly or with reckless disregard in evaluating and denying the claim is based solely on the Complaint's failure to completely state the relevant suicide provision in the Policy." (*Id.* at ¶ 31). Thus, because the plain language of the [Replacement] Policy provided Defendants "a reasonable basis for its coverage determination," they claim Count V must be dismissed. (*Id.* at ¶ 32).

The Pennsylvania legislature has enacted a statute permitting a cause of action against an insurance company based on the insurer's bad faith. It provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following action:
>
> > (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
> >
> > (2) Award punitive damages against the insurer.
> >
> > (3) Assess court costs and attorney fees against the insurer.

42 Pa. C.S.A. § 8371. "To establish a bad-faith claim, the beneficiary must prove, by clear and convincing evidence, that the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim." *Lincoln Benefit Life Co. v. Bowman*, 221 F. Supp. 3d 617, 632 (E.D. Pa. 2016) (citations omitted). "Refusing to pay without conducting a

reasonable investigation of all available information is sufficient." (*Id.*) (citing *Post v. St.*

*Paul Travelers Ins. Co.*, 691 F.3d 500, 515-16, 522-23 (3d Cir. 2012)). "To defeat a claim of

bad faith an insurer need not show that the insurer was correct; rather, an insurer must

demonstrate that it had a reasonable basis for its decision to deny benefits." *Smith*, 904 F.

Supp. 2d at 524.

At this early stage of the proceedings, Plaintiffs plausibly allege facts, which the

Court must accept as true, supporting the statutory bad faith claim alleged in Count V.

Defendants' motion to dismiss Count V will therefore be denied.

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss will be granted in part and

denied in part. A separate Order follows.

Robert D. Mariani
United States District Judge