## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NICHOLAS LOMMA, and J.L., a Minor,  :
by ANTHONY LOMMA, Guardian          :
                                    :
     **Plaintiffs,**               :
   **v.**                             :   **3:16-CV-2396**
                                    :   **(JUDGE MARIANI)**
OHIO NATIONAL LIFE ASSURANCE         :
CORPORATION, and OHIO NATIONAL       :
LIFE INSURANCE COMPANY,              :
                                    :
     **Defendants.**               :

## MEMORANDUM OPINION

### I. INTRODUCTION

This is an insurance action against Defendants Ohio National Life Assurance

Corporation and Ohio National Life Insurance Company for life insurance proceeds.

Plaintiffs Nicholas Lomma and J.L., a minor, by his guardian, Anthony Lomma, seek to

recover $100,000 as beneficiaries of a life insurance policy issued by Defendants on the life

of their mother, Lora Marie Lomma, who committed suicide in May of 2009. Defendants

have denied payment of full death benefits based on a suicide exclusion in the policy.

On September 6, 2017, the Court granted Defendants' motion to dismiss in part and

denied the motion in part, allowing the breach of contract, breach of implied covenant of

good faith and fair dealing, and statutory bad faith claims to proceed because Plaintiffs had

sufficiently pled ambiguity in the contract language and a reasonable expectation of

coverage, and plausibly pled bad faith on the part of Defendants. Doc. 24. Presently before

the Court are cross motions for summary judgment by both Plaintiffs and Defendants. Both motions primarily concern the same issue: whether the suicide exclusion precludes Plaintiffs from full coverage under the policy. Docs. 29, 31. For the reasons that follow, Plaintiffs' motion will be granted in part and denied in part, and Defendants' motion will be granted in part and denied in part.

## II. STATEMENT OF UNDISPUTED FACTS

Both parties have submitted Statements of Material Facts as to which they submit there is no genuine issue or dispute for trial for their respective motions for summary judgment. Docs. 29, 31. Both parties have also submitted responses to the statements of material facts in their opposition to the opposing party's motion for summary judgment. Docs. 38, 39. The parties base their arguments primarily on Ms. Lomma's policy with Defendants and related policy documents such as the "Notice Regarding Replacement of Life Insurance and Annuities" (the "Notice"), which had already been presented to the Court through Defendant's motion to dismiss. Doc. 4-4. Thus, the factual issues remain substantively the same as those presented at the motion to dismiss stage. The following facts are not reasonably in dispute except as noted.

Ms. Lomma committed suicide on May 24, 2009. Doc. 29 ¶ 6. Plaintiffs, Nicholas Lomma and J.L., the surviving children of Ms. Lomma, bring suit against Defendants for the denial of life insurance benefits. Doc. 1-4 ¶¶ 1-2. In September 1986, Ms. Lomma was issued a life insurance policy (the "Original Policy") by Pennsylvania National Life Insurance

2

Company with a coverage amount of $25,000. Doc. 29 ¶ 1. The Original Policy contained a suicide exclusion, which states "SUICIDE: If, within two years from the Issue Date, the Insured, while sane or insane, commits suicide, our liability will be limited to a refund of the premium paid less any Policy Indebtedness and Partial Withdrawals." Doc. 29-2 at 15. In 1994, Defendants Ohio National Life Assurance Corporation and/or Ohio National Life Insurance Company "purchased or otherwise acquired the Original Policy from Pennsylvania National Life Insurance Company." Doc. 29 at ¶ 2. Although this assertion is "denied as stated" by Defendants, they do not deny that the assumption of the policy occurred. Doc. 38 ¶ 2. Instead, they clarify that only Defendant Ohio National *Life Assurance* Corporation "assumed" the Original Policy, and that Defendant "Ohio National *Life Insurance* Company was not involved in the transaction." *Id.* (emphasis added). In support of their "denial", Defendants submitted a 2006 letter from Ohio National *Life Assurance* Corporation to Ms. Lomma, clarifying "a drafting error" with respect to a formula set forth in the policy as required by the Internal Revenue Code (the "2006 Letter"). Doc. 38-2 at 38. The "drafting error" bears no relevance to the case at hand. Rather, the 2006 Letter is introduced solely for the proposition that Ohio National *Life Assurance* Corporation is the only Defendant that contracted with Ms. Lomma. *Id.* (2006 Letter stating "[a]s you know, Ohio National *Life Assurance* Corporation has been administering your policy since June 30, 1994, when we assumed all obligations and liabilities under your policy as originally issued by Pennsylvania National Life Insurance Company") (emphasis added).

However, Defendants do not explain why the distinction between the two Ohio National entities is significant, nor do they base their legal arguments on this distinction. Indeed, Defendants have chosen to jointly file all motion papers to the Court. Further, Defendants repeatedly refer to themselves jointly as "Ohio National" in all motion papers, even though there are two "Ohio National" entities. Thus, the Court finds that it is undisputed that Defendants assumed the Original Policy from Penn National Life Insurance Company in 1994.

On December 4, 1995, Ms. Lomma increased the amount of coverage under the Original Policy with Defendants from $25,000 to $100,000. Doc. 29 ¶ 3. *See also* Doc. 29-3 at 3 (December 14, 1995 Letter from Defendants, stating that "[u]pon written request . . . the stated amount is hereby increased from $25,000 to $100,000 effective December 4, 1995"). On June 6, 2007, Ms. Lomma filed an application for a new life insurance policy with Defendants with a coverage amount of $100,000 (the "Replacement Policy"). Doc. 29 ¶ 4. *See also* Doc. 29-4 (Ms. Lomma's application for change of policy).[1] On August 15, 2007, Defendants issued the Replacement Policy to Ms. Lomma with a benefit value of $100,000. *Id.* ¶ 5. While the amount of insurance coverage stayed the same, the parties dispute whether the beneficiaries changed upon the switch to the Replacement Policy. According to Plaintiffs, the beneficiaries under the Replacement Policy "were identical to

---

[1] Defendants dispute that the last seven pages of Doc. 29-4 were "part of the application submitted by [Ms. Lomma]," but admit the validity of the rest of the document. Doc. 38 ¶ 4. Because the disputed portion is not relevant to the disposition of the case, the Court will not consider the disputed portion in its ruling.

4

those under the Original Policy." *Id.* However, the documents submitted by the parties reflect a change in the designation of beneficiaries at the time of the policy switch. *Compare* Doc. 38-2 at 20 (Original Policy designating Anthony Lomma as the primary beneficiary and Ms. Lomma's children as contingency beneficiaries) *with* Doc. 29-4 at 3 (Application for change of policy listing Nicholas Lomma as the primary beneficiary and J.L. as the contingent beneficiary).

As part of the switch in policy, Defendants provided Ms. Lomma a "Notice Regarding Replacement of Life Insurance and Annuities," which was executed in June, 2007. Doc. 31 at 9; *see also* Doc. 31-3 at 39. It provides:

> You should recognize that a policy that has been in existence for a period of time may have certain advantages to you over a new policy....Under your existing policy, the period of time during which the issuing company could contest the policy because of a material misrepresentation or omission concerning the medical information requested in your application, or deny coverage for death caused by suicide, may have expired or may expire earlier than it will under the proposed policy.

*Id.* While the Notice was attached to Defendants' motion to dismiss, the Court declined to consider it then because it was not "undisputedly authentic" nor "integral to Plaintiffs' Complaint, but is instead relevant to Defendants' *affirmative defenses*." Doc. 24 at 8 n.5 (emphasis in original). At this stage, however, the Notice is properly before the Court as part of the record, and its validity is undisputed by Plaintiffs. *See* Doc. 39 ¶ 4 (admitting the language in the Notice but denying its "legal effect imputed by Defendants onto this provision").

5

Defendants issued the Replacement Policy to Ms. Lomma in August, 2007. Doc. 31-3 at 1-34 (hereinafter the "Replacement Policy"). It contains a definition of "Contract Months and Years," which states: "[t]his contract takes effect on the contract date shown on page 3. Contract months and years are marked from the contract date. The first day of the contract year is the contract date and its anniversaries." *Id.* at 11. Page 3 of the Replacement Policy contains two dates, neither of which is labeled the "contract date". Instead, page 3 shows a "Policy Date" of August 10, 2007 and an "Issue Date" of August 15, 2007. *Id.* at 7.

The Replacement Policy, like the Original Policy, contains a suicide exclusion. The two exclusions, however, do not contain the same language. The suicide exclusion in the Replacement Policy provides:

> If the insured dies by suicide while sane or insane or by intentional self-destruction while insane, we will not pay any death proceed[s] payable on **amounts of insurance** which have been in effect for less than 2 years. If the suicide or intentional self-destruction is within the first 2 **contract years**, we will pay as death proceeds the premiums you paid.

Replacement Policy at 13 (emphasis added). Although the Replacement Policy defines the term "contract years," it does not contain a definition for "amounts or insurance", nor does it provide any guidance on how to determine which "amounts of insurance" have "been in effect for less than 2 years."

Shortly after Ms. Lomma's death, Mr. Lomma filed a claim for death benefits on behalf of his children, the beneficiaries under the Replacement Policy. Doc. 29 ¶ 7. On August 31, 2009, Defendants informed Mr. Lomma that they would not pay the full benefit

6

value under the policy, but instead, pay "$285.12 plus interest at 4.5%," which represents

the "premiums paid on the policy." Doc. 31-3 at 36. The letter explained that Defendants'

investigation revealed that Ms. Lomma died by suicide, and in accordance with the policy's

suicide exclusion, "the death proceeds for death due to 'Suicide' within the first two contract

years is a refund of premiums paid." Id.

Plaintiffs brought suit against Defendants for the full $100,000 in coverage, alleging

five causes of action: (1) breach of contract; (2) unjust enrichment; (3) promissory estoppel;

(4) breach of implied covenant of good faith and fair dealing; and (5) statutory bad faith

pursuant to 42 Pa. C.S.A. § 8371. Doc. 1-4. At the motion to dismiss stage, the Court

found the suicide exclusion to be ambiguous, and denied Defendants' motion with respect

to the breach of contract, breach of implied covenant of good faith and fair dealing, and

statutory bad faith claims. Doc. 25 (denying the motion to dismiss with respects to Counts I,

IV, and V). Finding the unjust enrichment and promissory estoppel claims to be precluded

by the existence of an express contract between the parties, the Court dismissed Counts II

and III of the Complaint. Id.

After discovery, Defendants moved for summary judgment on all three remaining

claims. Doc. 31. Meanwhile, Plaintiffs moved for summary judgment on the breach of

contract claim and the statutory bad faith claim.[2] Both parties have largely recycled their

arguments from the motion to dismiss briefing for their briefing on summary judgment.

---

[2] Plaintiffs did not move for summary judgment on the breach of implied covenant of good faith claim. It is unclear whether this omission is intentional or inadvertent.

Further, the parties have added no additional evidence to the record since the Court's ruling

on motion to dismiss, but instead focus their arguments on the legal interpretation of the

policy language. The only "new" document relevant to the insurance transaction at issue is

the Notice, which had been attached to Defendant's motion to dismiss but was declined to

be considered by this Court as extrinsic to the Complaint. Doc. 24 at 8 n. 5. *See also* Doc.

43 at 1-2 (Defendants' reply brief in support of their motion for summary judgment arguing

that "evidence that this court did not consider in ruling on Ohio National's motion to dismiss

is now available for consideration," and citing exclusively to the Notice, which "must now be

considered as evidence supporting Ohio National's interpretation of the suicide exclusion

and motion for summary judgment"). The parties do not dispute the validity of the relevant

documents before the Court, nor have they presented any disputed issues of fact through

any discovery evidence, such as use of deposition testimony. Thus, it appears that the

parties' sole dispute turns on the interpretation of the suicide exclusion when viewing the

policy and related documents as whole. For reasons stated below, the Court will grant

summary judgment in favor of Plaintiffs on the breach of contract claim, and summary

judgment in favor Defendants on the breach of implied covenant of good faith and statutory

bad faith claims.

## III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not

present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality,

8

...[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson,* 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW,*

*Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912,

113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party

only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380, 127

S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary

judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts. Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial. The mere existence of some alleged factual dispute between
> the parties will not defeat an otherwise properly supported motion for
> summary judgment; the requirement is that there be no *genuine* issue of
> *material* fact. When opposing parties tell two different stories, one of which is
> blatantly contradicted by the record, so that no reasonable jury could believe
> it, a court should not adopt that version of the facts for purposes of ruling on a
> motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## IV. ANALYSIS

### A. The Breach of Contract Claim Will Be Resolved in Plaintiffs' Favor

"The interpretation of an insurance contract regarding the existence or non-existence

of coverage is 'generally performed by the court.'" *Minnesota Fire & Cas. Co. v. Greenfield,*

855 A.2d 854, 861 (Pa. 2004) (quoting *General Accident Insurance Co. of America v. Allen,*

692 A.2d 1089, 1093 (Pa. 1997)). In interpreting an insurance contract, the Court must

"ascertain the intent of the parties as manifested by the terms used in the written insurance

policy." *Donegal Mut. Ins. Co. v. Baumhammers,* 938 A.2d 286, 290 (Pa. 2007) (citing *401*

10

*Fourth Street, Inc. v. Investors Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005)). "[W]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other than that expressed." *Lesko v. Frankford Hosp.-Bucks Cnty.*, 15 A.3d 337, 342 (Pa. 2011) (quoting *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982)); *see also Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 481 (Pa. 2006) ("When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself.") (citations omitted). "Where a contract provision is ambiguous, however, extrinsic evidence may be properly admitted in an attempt to resolve the ambiguity." *Beta Spawn, Inc. v. FFE Transportation Servs., Inc.*, 250 F.3d 218, 227 (3d Cir. 2001) (citing *In re Herr's Estate*, 161 A.2d 32, 34 (Pa. 1982)).

In the context of insurance contracts, Pennsylvania courts have adopted "the *contra proferentem* principle of interpretation...by which ambiguities in policies are construed against the insurer." *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 905 (3d Cir. 1997) (internal citations omitted). Under this principle, when a provision in an insurance policy is ambiguous, "the policy is to be construed in favor of the insured . . . and against the insurer, as the insurer drafts the policy and controls coverage." *Baumhammers*, 938 A.2d at 290 (quoting *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006)). *See also West v. Lincoln Benefit Life Co.*, 509 F.3d 160, 169 (3d Cir. 2007) ("An unclear, ambiguous provision will be construed against the insurer and

in favor of the insured."). Furthermore, "[w]here an insurer relies on a policy exclusion as the basis for its denial of coverage and refusal to defend, the insurer has asserted an affirmative defense and, accordingly, bears the burden of proving such defense." *Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 435 (3d Cir. 2006) (quoting *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999)). "Exclusionary clauses generally are strictly construed against the insurer and in favor of the insured." *Swarner v. Mut. Benefit Grp.*, 72 A.3d 641, 645 (Pa. Super. Ct. 2013) (citations omitted).

Another principle adopted by Pennsylvania courts in order "to favor the insured" is the reasonable expectations doctrine. *Moessner*, 121 F.3d at 905 ("In recognition of the unique dynamics between insurer and insured, courts have attempted to favor the insured in a number of ways, including adapting the *contra proferentem* principle of interpretation to the insurance context…and the reasonable expectations doctrine." ) (internal citations omitted). Pennsylvania law "dictates that the proper focus for determining issues of insurance coverage is the reasonable expectations of the insured." *Id.* (citing *Collister v. Nationwide Life Insurance Co.*, 388 A.2d 1346 (Pa. 1978) and *Tonkovic v. State Farm Mutual Automobile Insurance Co.*, 521 A.2d 920 (Pa. 1987)). "[I]n most cases the language of the insurance policy will provide the best indication of the content of the parties' reasonable expectations." *Bensalem Twp. v. International Surplus Lines Ins. Co.*, 38 F.3d 1303, 1309 (3d Cir. 1994)). "Courts, however, must examine 'the totality of the insurance

transaction involved to ascertain the reasonable expectations of the insured.'" *Moessner*,

121 F.3d at 903 (quoting *Dibble v. Sec. of Am. Life Ins. Co.*, 590 A.2d 352, 354 (Pa. Super.

Ct. 1991)). "As a result, even the most clearly written exclusion will not bind the insured

where the insurer or its agent has created in the insured a reasonable expectation of

coverage." *Id.* (citations omitted).[3]

In its motion to dismiss opinion, the Court found that Plaintiffs had adequately

alleged that the suicide exclusion is ambiguous and that Ms. Lomma had a reasonable

expectation of coverage. Doc. 24 at 13-39. As the parties have produced almost no new

evidence before the Court, and given that their central dispute is the correct legal

interpretation of the suicide exclusion, the Court will once again begin its analysis with the

contract language. The suicide exclusion, which is at the heart of the parties' dispute,

contains only two sentences:

> If the insured dies by suicide while sane or insane or by intentional self-
> destruction while insane, we will not pay any death proceed[s] payable on
> amounts of insurance which have been in effect for less than 2 years. If the

---

[3] In its motion to dismiss opinion, the Court noted that it "need not, at this stage of the proceedings, predict whether the Pennsylvania Supreme Court would require Defendants to prove that Ms. Lomma had no reasonable expectation of coverage by clear and convincing evidence or by a preponderance of the evidence. Pennsylvania law, as decided by the Pennsylvania Supreme Court and predicted by courts in this Circuit, is not consistent on this issue." Doc. 24 at 39 n. 11 (collecting cases applying either the "clear and convincing" standard or the "preponderance of the evidence" standard). Without predicting which standard the Pennsylvania Supreme Court will ultimately endorse, the Court will proceed under the heavier burden of proof, i.e. the "clear and convincing evidence" standard. *See West v. Lincoln Ben. Life Co.*, 509 F.3d 160, 171 (3d Cir. 2007) (noting the inconsistent Pennsylvania law on the standard of proof for insurer-defendants' affirmative defenses, and proceeding under the "clear and convincing" standard because "it is the heavier burden"). Imposing the heavier burden of proof on the insurer's affirmative defense would be the consistent with Pennsylvania's principles of construing insurance policies in favor of the insured and against the insurer.

13

suicide or intentional self-destruction is within the first 2 contract years, we will pay as death proceeds the premiums you paid.

Replacement Policy at 13. Defendants seek summary judgment on the breach of contract claim based on the same arguments from their motion to dismiss, namely, that the suicide exclusion's *second* sentence bars coverage for the full policy value of $100,000, and Plaintiffs could not have reasonably expected full coverage based on the plain language of the suicide exclusion. *See* Doc. 31 at 15-20; *see also* Doc. 38 at 14-15 (Defendants' brief in opposition to Plaintiffs' motion for summary judgment arguing the same). In support of their argument, Defendants point to the fact that "contract years" is a defined term in the policy, which states "[t]his contract takes effect on the contract date shown on page 3. Contract months and years are marked from the contract date." Replacement Policy at 11. Because the second sentence of the exclusion provides that Defendants only need to pay back premium payments if the insured commits suicide "within the first 2 contract years," Defendants argue that they correctly applied the exclusion to Plaintiffs' case by returning the premiums paid by Ms. Lomma on the Replacement Policy. Doc. 31 at 15-16. They further argue that the two sentences of the exclusion should be treated as independent sentences that "addresses two different situations: a) any increase in the benefit amount under the [Replacement] Policy, and b) suicide within two years of the start of the contract." *Id.* at 16. Under Defendants' reading, the first sentence is irrelevant to Plaintiffs' case since no increase in the benefit has occurred within two years of Ms. Lomma's suicide—and thus no increase in "amounts of insurance" has been "in effect for less than 2 years." However, the

14

second sentence separately and independently bars coverage, since Ms. Lomma committed suicide less than two years after Replacement Policy's contract date.

Plaintiffs, predictably, ask the Court to focus on the first sentence of the exclusion, which indicates that if the "amounts of insurance" has been in effect for more than two years, the suicide exclusion does not apply. *See, e.g.,* Doc. 30 at 7 ("Given that Ms. Lomma had the same amount of insurance for over thirteen years, her death does not fall within the suicide exclusion...[The second sentence] *only applies when the insured's death falls within the suicide exclusion.* As Ms. Lomma's suicide does not fall within the exclusion, the second sentence is irrelevant in this case.") (emphasis in original). In other words, Plaintiffs argue that the "amounts of insurance" has been "in effect" since 1995, when Ms. Lomma increased her coverage with Defendants from $25,000 to $100,000. *See* Doc. 30 at 5-9; *see also* Doc. 40 at 5-6 (Plaintiffs' brief in opposition to Defendants' motion for summary judgment arguing the same). Plaintiffs argue that at the very least, the first sentence renders the exclusion as a whole ambiguous, and due to Pennsylvania's principle that ambiguous insurance contracts should be "construed strictly against the insurer," they are entitled to summary judgment in their favor. *Id.* at 9 (citing *East Coast Equipment Co. v. Maryland Casualty Co.*, 218 A.2d 91 (Pa. Super. Ct. 1966)). Finally, in response to Defendants' criticism that this reading would render the second sentence superfluous, Plaintiffs argue that their "interpretation does not render the second sentence of the suicide exclusion null." Doc. 40 at 5. Rather, "[t]he second sentence can be interpreted to mean

15

that *if* the suicide exclusion applies under the first sentence, the premiums paid will be refunded to the insured. Such an interpretation would not alter the fact that the suicide exclusion does not apply to the case at bar, because its applicability depends on when Ms. Lomma obtained $100,000.00 of insurance coverage." *Id.* at 5-6 (emphasis added).

In other words, both parties ask the Court to focus almost exclusively on one sentence of the suicide exclusion while discounting the other. It is true that the key term in the second sentence, "contract years," is defined in the policy. By contrast, the key term in the first sentence, "amounts of insurance," is not defined. However, that does not necessitate ignoring the first sentence in favor of the second. First, while "contract years" is assigned a specific definition in the policy, the definition itself is not entirely clear. It states that contract years "are marked from the *contract date*" and that "[t]his contract takes effect on the *contract date* shown on page 3." Replacement Policy at 11 (emphasis added). However, page 3 of the contract contains two dates, neither of which are labeled the "contract date". Instead, the page provides a "Policy Date" of August 10, 2007 and an "Issue Date" of August 15, 2007. *Id.* at 7. Thus, the definition of "contract years" is confusing at least to the extent that it depends on the term "contract date", which does not appear on page 3 of the contract, as the definition had suggested.

More importantly, even if the term "contract years" *had* been clearly defined, its usage in the suicide exclusion still creates a latent ambiguity. Under Pennsylvania law, "[a]mbiguity in a contract can be either patent or latent." *Bohler-Uddeholm Am., Inc. v.*

*Ellwood Grp., Inc.*, 247 F.3d 79, 93 (3d Cir. 2001). "While a patent ambiguity appears on the face of the instrument, 'a latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous.'" *Id.* (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir.1995)). "A party may use extrinsic evidence to support its claim of latent ambiguity, but this evidence must show that some specific term or terms in the contract are ambiguous; it cannot simply show that the parties intended something different that was not incorporated into the contract." *Id.*

Here, Ms. Lomma maintained a continuous contractual relationship with Defendants since 1994, when Defendants "purchased or otherwise acquired the Original Policy from Pennsylvania National Life Insurance Company." Doc. 29 at ¶ 2.[4] A year later, Ms. Lomma requested an increase in her coverage with Defendants from $25,000 to $100,000, which Defendants approved. *See* Doc. 29-3 at 3 (December 14, 1995 Letter sent from Ohio National Life Assurance Corporation to Ms. Lomma, stating that "[u]pon written request . . . the stated amount [of the Original Policy] is hereby increased from $25,000 to $100,000 effective December 4, 1995"). Accordingly, Ms. Lomma had maintained a life insurance policy with a value of $100,000 with Defendants from 1995 until the time of her death.

---

[4] As discussed above, while Defendants "denied" this assertion by clarifying that only Ohio National *Life Assurance* Corporation "assumed" the Original Policy, and that Defendant "Ohio National *Life Insurance* Company was not involved in the transaction," they do not explain why this distinction is relevant to their arguments, and in fact refer to themselves jointly as "Ohio National" throughout their motion papers. Doc. 38 ¶ 2 (emphasis added). Thus, for purposes of this opinion, the Court finds that it is undisputed that Defendants assumed the Original Policy from Penn National Life Insurance Company in 1994.

While defined elsewhere in the policy, the term "contract years" is not capitalized, bolded, or italicized in the suicide exclusion. Thus, there is nothing in the exclusion to indicate that it is a specialized, defined term. Thus, given the fact that she had maintained a policy worth the same value with Defendants since 1995, Ms. Lomma could have reasonably interpreted the term "contract years" to mean the duration of the contractual relationship between her and Defendants, rather than recognizing that it refers to a specifically defined term in the policy. In other words, the contract contains a latent ambiguity because it does not account for the continuous, preexisting relationship between the parties. Had the Replacement Policy been the *first* contract that Ms. Lomma executed with Defendants, the exclusion could have no latent ambiguous effect. However, it is undisputed that Ms. Lomma had maintained a life insurance policy with Defendants with the same amounts of insurance in effect since 1995. *See, e.g.,* Doc. 29-3 at 3 (December 14, 1995 Letter from Ohio National stating that "[u]pon written request . . . the stated amount is hereby increased from $25,000 to $100,000 effective December 4, 1995").

Defendants ignore the longstanding contractual relationship with Ms. Lomma, and instead emphasize that the Original Policy "is a separate and distinct contract from the [Replacement] Policy," which was executed in 2007. Doc. 31 at 17. They argue that "[o]nce an insurance policy has been cancelled and replaced, it is no longer enforceable and cannot form the basis for the payment of benefits to an insured." *Id.* (citing *Scott v. Sw. Mut. Fire Ass'n*, 647 A.2d 587 (Pa. 1994)). However, *Scott* is of limited application to this case. It

18

involved a dispute where the insurer-defendant argued that, despite the lack of strict compliance with policy cancellation provisions, plaintiffs had effectively cancelled their homeowner policy prior to a fire in their home. The court found that in that case, plaintiffs had evinced an objective intent to cancel their policy with the defendant because they spoke with a new insurance company about "the possible replacement of their [old] policy with a [new] policy" from the new company, declined to pay renewal premiums on their old policy, applied for insurance with the new insurance company, paid the new company an "initial premium...and received a 30 day binder of insurance" from them, "listed the expiration date of the [old] policy as January 13, 1989" in their application for the new policy, and "notified [the defendant's] agent regarding their transaction with [the new company], and their intent to replace the [old] policy with the [new] policy" two days before the fire. Scott, 647 A.2d at 594. "Additionally, when [plaintiff] telephoned [the new company] after the fire to give notice of the loss, she specifically stated to a [] representative that she had cancelled the [old] policy just two days prior to the date of the fire." Id. at 595. Finally, when the new insurer contacted the plaintiffs' old insurer, the latter confirmed that plaintiffs "had, in fact, cancelled the [old] policy, effective January 13, 1989." Id. It was not until three months after the fire that plaintiffs filed a claim with the old insurer, and "[a]s of that date, the [plaintiffs] still had not paid any premiums to [the old insurer] for the current policy year." Id. Based on these facts, the court found that the old insurer can have no liability when plaintiffs "actions and inaction in this case clearly demonstrated an objective intent to cancel the [old] policy prior

to the date of the fire." *Id. Scott* is unlike the case here, where the insured did not switch

insurance companies, but maintained a life insurance policy with the same insurer for the

same amount of coverage continuously for over a decade.

Defendants also cite to contractual language outside of the suicide exclusion in

support of their argument that coverage is precluded. First, they point to a section in the

Replacement Policy called "Illustration of Benefits," which provides certain caveats and

information about the policy, including the following provision:

Death benefit is the amount payable upon death as of the end of the policy
year. However, this amount may not be payable if death is due to an
excluded cause such as suicide during the first two years.

Replacement Policy at 32. Second, Defendants point out that at the time Ms.

Lomma switched to the Replacement Policy, she was provided a Notice stating: "under your

existing policy [i.e. the Original Policy], the period of time during which the issuing company

could...deny coverage for death caused by suicide, may have expired or may expire earlier

than it will under the proposed policy." Doc. 31-3 at 39. Defendants argue that the

Illustration of Benefits and the Notice expressed the possibility that the Original Policy may

have been more advantageous to Ms. Lomma, since the insurer's time to contest coverage

pursuant to the suicide exclusion may have expired.

However, the Illustration of Benefits and the Notice are not dispositive because both

contain qualifying, conditional language. Both texts are couched in words such as "could,"

"may not," and "may have," rendering the statements to be of limited use to a reasonable

20

insurance purchaser. The Illustration of Benefits merely references suicide as an example of "excluded causes" under which benefits "may not be payable." Replacement Policy at 32. It does not provide any definitive language about the application of the suicide exclusion, nor does it point the reader to the relevant page containing the exclusion. Further, its usage of the phrase "suicide during the first two years" is even less clear than the suicide exclusion's language, which used the defined term "contract years" in its second sentence. The Illustration of Benefits, by contrast, does not use a defined term, nor does it provide a date from which the "first two years" would begin to run.

The Notice contains similarly conditional language. It states that "the period of time during which the issuing company could...deny coverage for death caused by suicide, may have expired or may expire earlier than it will under the proposed policy." Doc. 31-3 at 39. Defendants, as both the existing and replacement insurer, were in the better position to inform Ms. Lomma that the suicide exclusion in the Original Policy would in fact be nullified, not, as the Notice states, "may have expired or may expire earlier than it will under the proposed policy." *Id.* This qualified language does not conclusively compel the reading that the suicide exclusion period started anew in 2007. Because a preexisting long-term contractual relationship existed between the parties, the suicide exclusion's second sentence contains a latent ambiguity. Under Pennsylvania's well-established principle that any ambiguities in an insurance policy "should be construed in favor of the insured and against the insurer, the drafter of the agreement," the latent ambiguity of the suicide

21

exclusion should be resolved in favor of Plaintiffs. *Moessner*, 121 F.3d at 900-01. *See also DiFabio v. Centaur Ins. Co.*, 531 A.2d 1141, 1144 (Pa. Super. Ct. 1987) ("The circumstances of this case thus expose a latent ambiguity in the terms of the windstorm coverage. The parties, moreover, have neither pleaded facts nor offered extrinsic evidence that would aid the court in resolving the ambiguity. We must therefore resolve the problem by construing the contract against the drafter and in favor of coverage for Ms. DiFabio.").

Even if the exclusion contained no latent ambiguity, Defendants' arguments would still fail because Plaintiffs have established a reasonable expectation of coverage. As stated above, in Pennsylvania, "[t]he reasonable expectation of the insured is the focal point of the insurance transaction." *Collister*, 388 A.2d at 1353. "Thus, regardless of the ambiguity, or lack thereof, inherent in a given set of insurance documents…the public has a right to expect that they will receive something of comparable value in return for the premium paid." *Id. See also Moessner*, 121 F.3d at 903 ("even the most clearly written exclusion will not bind the insured where the insurer or its agent has created in the insured a reasonable expectation of coverage."); *Dibble*, 590 A.2d at 355 ("By simply directing us to unambiguous language in the application and policy, Security of America has not established by clear and convincing evidence that the Dibbles were *unreasonable* in believing that coverage began upon their payment of the first premium.") (emphasis added). This principle stems from the same concern that gave rise to the *contra proferentem* principle that resolves ambiguity in favor of the insured, namely, the inherent "adhesive

nature of insurance contracts." *Fry v. Phoenix Ins. Co.*, 54 F. Supp. 3d 354, 362 (E.D. Pa. 2014) ("Courts in Pennsylvania, noting the adhesive nature of insurance contracts, have found that some 'normal contract principles' do not apply. For example, when a Pennsylvania court considers an insurance contract, it does not only evaluate it for ambiguity, but also considers the 'reasonable expectation of the insured.' Such an evaluation is not limited to situations where the contract is ambiguous") (internal citations omitted).

In this case, Ms. Lomma could have reasonably believed that the suicide exclusion expired two years after she first began paying premiums on a life insurance policy with Defendants worth $100,000. Because the Original Policy and the Replacement Policy provided continuous coverage for Ms. Lomma's life, both of which had the same amount of insurance value and were obtained from the same insurer, it is reasonable to expect that the suicide exclusion expired two years after Ms. Lomma began maintaining a policy worth $100,000. As the drafter of both policies, Defendants could have drafted a clearer provision stating that the exclusion's expiration period is not measured by when the "amounts of insurance" have been in effect, but by the *most recent* contract's issuance date. Instead, Defendants have created an ambiguous provision that alludes to two distinct time periods: when the "amounts of insurance [] have been in effect for less than 2 years" and when the insured commits suicide "within the first 2 contract years." Replacement Policy, at 13.

As the Court's motion to dismiss opinion noted, "the language in the suicide exclusion...is anything but a 'standard' suicide exclusion. Many key dates necessary to both provide notice to Ms. Lomma and aid in the Court's interpretation are not referenced in the suicide exclusion." Doc. 24 at 33. "Unlike every [other] suicide exclusion the Court has reviewed, the first sentence of the suicide exclusion in the Replacement Policy neither defines nor bases its applicability on the 'Date of Issue,' the 'Effective Date,' or some expressly defined date in the policy." Id. at 34 n. 8 (collecting cases where the suicide exclusions were exclusively defined by a specific, defined term such as "Date of Issue shown in the Schedule," "Issue Date," or "Effective Date"). The suicide exclusion in this case, by contrast, refers to two different time periods in two successive sentences. Moreover, it does not provide a conjunction or other clarifying language to indicate whether the provision is describing two distinct situations, each of which could independently operate to preclude coverage, or describing a single scenario under which coverage would be precluded.

As discussed above, the extrinsic evidence to the contract is of little help in resolving the ambiguity. The Notice signed by Ms. Lomma at the time of the policy switch does not render the suicide exclusion unambiguous because it uses conditional and qualified language. Further, the extrinsic evidence does not clarify the latent ambiguity created by the exclusion—namely, its reference to "contract years," while a defined term, does not indicate how "contract years" should be measured in the context of a preexisting

24

relationship between the parties involving continuous policies covering the same "amounts of insurance." Thus, the exclusion, both in isolation and in the context of extrinsic documents such as the Notice, can be reasonably interpreted to mean that Defendants intended to pay full benefits to Plaintiffs as long as the insured's suicide occurred two years after the amounts of insurance had been in effect. In light of the contractual relationship between her and Defendants, Ms. Lomma could have reasonably expected that the policy would grant full coverage to her beneficiaries because the suicide exclusion only imposed a two-year period from the time she first acquired the "amounts of insurance" in question. "The goal of interpreting an insurance policy, like that of interpreting any other contract, is to determine the intent of the parties." *Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 163 (3d Cir. 2011) (citing *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999)). Had Defendants intended to use the most recent policy date to calculate the exclusion period, it could have done so. Thus, Plaintiffs have established that Ms. Lomma could have reasonably expected coverage for her beneficiaries upon her death in 2009.

"In cases where the wording is ambiguous, relevant extrinsic evidence should be considered to resolve the ambiguity." *Nat'l Cas. Co. v. Young*, 2009 WL 2170105, at *3 (E.D. Pa. July 17, 2009). However, if "such evidence does not resolve the dispute, the policy provision is to be construed in favor of the insured and against the insurer as the drafter of the agreement." *Id.* In this case, because the available extrinsic evidence does not aid in resolving the ambiguity of the suicide exclusion, and having decided that Plaintiffs

25

had established a reasonable expectation of coverage, the Court finds that summary judgment in favor of Plaintiffs is appropriate. *See 12th St. Gym, Inc. v. Gen. Star Indem. Co.*, 980 F. Supp. 796, 803 (E.D. Pa. 1997) ("The extrinsic evidence is insufficient to resolve the ambiguity, and, since a mutual understanding of the exclusion is lacking, the provision should be construed in favor of the insured....On the parties' respective cross-motions for summary judgment, a decision will be entered in favor of plaintiffs...and against defendant.").

Summary judgment is especially warranted where, as here, the parties have failed to point to any material disputed issues of fact in the record. Instead, both sides have merely rehashed their previous arguments on motion to dismiss regarding the legal interpretation of the contract without offering additional extrinsic evidence that may shed light on the parties' contractual intent. *Cf. Murphy v. Coregis Ins. Co.*, 1999 WL 627910, at \*10 (E.D. Pa. Aug. 17, 1999) (finding material issues of fact existed when the parties disputed whether plaintiffs received notice of insurer's unilateral changes to insurance policy or that they understood the significance of those changes). Therefore, summary judgment will be entered in favor of Plaintiffs because where the insurance policy's ambiguity cannot be resolved by the available extrinsic evidence, "the policy is to be construed in favor of the insured . . . and against the insurer, as the insurer drafts the policy and controls coverage." *Baumhammers*, 938 A.2d at 290 (internal citation omitted). *See also Horace Mann Ins. Co. v. Alben*, 2008 WL 4238940, at \*10 (W.D. Pa. Sept. 10, 2008) (granting summary judgment in favor of

26

insureds on cross-motions for summary judgment when the insurer was unable to meet its "burden by clear and convincing evidence presented to this Court" that the insured did not have a reasonable expectation of coverage).

## B. The Breach of Implied Covenant of Good Faith Claim Will Be Dismissed Because It Is Based on the Same Conduct Underlying the Breach of Conduct Claim

While the dearth of discovery evidence supports summary judgment in favor of Plaintiffs on the breach of contract claim, the same cannot be said of the remaining two claims. In the breach of contract claim, the ambiguity should be resolved in favor of the Plaintiffs because of Pennsylvania's judicially constructed principles favoring the insured in the specific context of insurance contracts. However, no such principle applies to the breach of implied covenant of good faith claim or the statutory bad faith claim.

"The covenant of good faith and fair dealing involves an implied duty to bring about a condition or to exercise discretion in a reasonable way." *USX Corp. v. Prime Leasing Inc.*, 988 F.2d 433, 438 (3d Cir. 1993) (quotation marks, alterations and emphasis omitted). "In Pennsylvania, a duty of good faith and fair dealing is implicit in an insurance contract." *Smith v. Allstate Ins. Co.*, 904 F. Supp. 2d 515, 521 (W.D. Pa. 2012) (internal quotation marks omitted). "[A] claim for breach of the implied covenant of good faith and fair dealing is a breach of contract action, not an independent action for breach of a duty of good faith and fair dealing." *Cummings v. Allstate Ins. Co.*, 832 F. Supp. 2d 469, 473 (E.D. Pa. 2011) (citing *LSI Title Agency, Inc. v. Evaluation Servs., Inc.*, 951 A.2d 384 (Pa. Super. Ct. 2008)).

27

Thus, "Pennsylvania law does not recognize a separate breach of contractual duty of good faith and fair dealing where said claim is subsumed by a separately pled breach of contract claim." *Simmons v. Nationwide Mut. Fire Ins. Co.*, 788 F. Supp. 2d 404, 409 (W.D. Pa. 2011).

In its motion to dismiss opinion, the Court noted that a plaintiff may proceed on both claims at the pleadings stage "when those two actions are based on separate conduct." Doc. 24 at 44 (citing *Clunie-Haskins v. State Farm Fire & Cas. Co.*, 855 F. Supp. 2d 380, 388 (E.D. Pa. 2012)). But a plaintiff would be barred from proceeding on both claims if they are based on the same conduct. *See, e.g., King of Prussia Equip. Corp. v. Power Curbers, Inc.*, 158 F. Supp. 2d 463, 467 (E.D. Pa. 2001) ("Because the actions forming the basis of [the plaintiff's] breach of contract claim and its good faith and fair dealing claim are essentially the same, [the plaintiff] cannot pursue both causes of action."); *Smith*, 904 F. Supp. 2d at 522 (noting that "claims for breach of the contractual duty of good faith and fair dealing have been dismissed where Plaintiff also asserts a claim for breach of contract and Plaintiff's claim for breach of the duty of good faith and fair dealing is redundant") (citations omitted).

On motion to dismiss, the Court found that the "spare, but pointed allegations" of the Complaint plausibly suggested that Plaintiffs complained of extraneous conduct by Defendants outside the scope of the parties' contractual dealings, including vague references of a "promise" made by Defendants to Ms. Lomma to pay the benefit amount of

$100,000. Doc. 24 at 45 (citing paragraphs 36, 37, 38, 44). However, after the benefit of full discovery, the parties have failed to adduce *any* additional evidence to what was presented to the Court at the pleadings stage with the exception of the Notice. Plaintiffs do not cite to any deposition testimony or evidence of the parties' communications regarding the benefits dispute in their opposition to Defendants' motion for summary judgment on the breach of covenant of good faith claim. Instead, they cite solely to the Court's motion to dismiss opinion and blithely inject that it "is an issue of fact for the trier of fact" without devoting any more analysis to the claim. Doc. 40 at 9. Plaintiffs are not entitled to proceed to trial when they have presented no evidence that the vague references of a "promise" by Defendants is in any way based on separate conduct aside from Defendants' denial of coverage based on their interpretation of the contract.

Indeed, the only evidence on this issue is Defendants' August 31, 2009 letter to Mr. Lomma denying coverage based on the suicide exclusion, which was an exhibit attached to the Complaint. *See* Doc. 1-4 at 69 (Complaint Exhibit E, August 31, 2009 letter). This letter was sent three months after Defendants received notice of Ms. Lomma's death. It states that Defendants' investigation revealed that Ms. Lomma died by suicide, and quotes the suicide exclusion in whole before denying coverage "in accordance with the above provision." Doc. 31-3 at 36. Thus, the sole evidence that may be relevant to the breach of the duty of good faith claim is Defendants' denial of benefits based on their interpretation of the suicide exclusion—i.e. the same conduct that forms the basis of Plaintiffs' breach of

contract claim. Since the record contains no evidence that the breach of contract claim and the breach of covenant of good faith claim are based on different conduct, the latter cannot withstand summary judgment. Accordingly, Count IV will be dismissed with prejudice.

## C. The Statutory Bad Faith Claim Will Be Dismissed Because There Is No Evidence in the Record Suggesting that Defendants' Investigation or Conduct Was Unreasonable

Finally, both parties seek summary judgment in their favor on the statutory bad faith claim. "In the insurance context, 'bad faith' means 'any frivolous or unfounded refusal to pay proceeds of a policy.'" *Bodnar v. Nationwide Mut. Ins. Co.*, 660 F. App'x 165, 167 (3d Cir. 2016) (quoting *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994)). *See also* 42 Pa. C.S.A. § 8371 (Pennsylvania statute providing remedies for insurance actions where "the insurer has acted in bad faith toward the insured"). "Bad faith must be demonstrated by clear and convincing evidence, even on summary judgment." *Id.* (quoting *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 523 (3d Cir. 2012)). "A reasonable basis is all that is required to defeat a claim of bad faith." *Post*, 691 F.3d 523 (quoting *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 367 (3d Cir.2004)). "Moreover, mere negligence or bad judgment does not constitute bad faith; knowledge or reckless disregard of a lack of a basis for denial of coverage is necessary." *Id.* (citation omitted).

Instead of presenting any evidence of bad faith obtained through discovery, Plaintiffs openly acknowledge that their "cause of action for bad faith is founded upon Ohio National's refusal to pay the insurance claim in light of the clear language of the suicide exclusion."

30

Doc. 30 at 10. *See also id.* at 11 (claiming that Defendants' denial of the claim for benefits "required reckless indifference to the ambiguity contained in the poorly drafted suicide exclusion"). In other words, Plaintiffs do not challenge or even mention Defendants' investigative process before denying the claim. Instead, their sole contention is that Defendants acted in bad faith because they relied on an interpretation more favorable to themselves when interpreting an ambiguous exclusion. But there is nothing nefarious about relying on a plausible interpretation of an ambiguous exclusion to deny coverage. As discussed above, the suicide exclusion is ambiguous, even when viewed in the totality of the insurance transaction involved. The Court cannot say that Defendants' denial of the benefits based on their interpretation of the exclusion was so unreasonable that it amounts to bad faith. An insurer's denial of benefits based on a plausible interpretation of an ambiguous contract, standing alone, is not sufficient to support a finding of bad faith by the Defendants.

In this case, Plaintiffs have not challenged any aspect of Defendants' investigative process. As stated above, Defendants conducted an investigation within three months of first receiving notice of Ms. Lomma's death, and explained its reasoning and reliance on the suicide exclusion in their letter to Mr. Lomma. *See* Doc. 31-3 at 36 (August 31, 2009 Letter informing Mr. Lomma that Defendants would only pay the Lommas "$285.12 plus interest at 4.5%" because Ms. Lomma's death certificate indicated that she died by "suicide" and that, in accordance with the policy's suicide exclusion, "the death proceeds for death due to

31

'Suicide' within the first two contract years is a refund of premiums paid"). "Bad faith is a

*frivolous or unfounded* refusal to pay, lack of investigation into the facts, or a failure to

communicate with the insured." *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d

742, 751 n.9 (3d Cir. 1999) (emphasis added). None of those conditions for bad faith are

borne by the evidence in this case. Plaintiffs have failed to point to any evidence that

Defendants acted unreasonably in the way they handled Plaintiffs' claim. *See, e.g., Bodnar*,

660 F. App'x at 167 (finding that insurer did not act in bad faith in its investigation and noting

that "Nationwide evaluated Bodnar's claim, consulted with legal counsel, and tried to

determine whether Berry was an employee or a temporary worker"). Accordingly, the

statutory bad faith claim will be dismissed.

## D. Plaintiffs' Motion to Strike Will Be Dismissed as Moot

Finally, several weeks after the parties filed their cross-motions for summary

judgment, Plaintiffs moved to strike Defendants' answer to the Complaint as untimely. Doc.

41. Because the Court will grant summary judgment on all remaining claims on their merits,

Plaintiffs' motion to strike Defendants' answer to the Complaint is moot. *See, e.g., United*

*States v. Beeman*, 2010 WL 653062, at *13 (W.D. Pa. Feb. 19, 2010) (granting motion for

summary judgment by Plaintiffs and holding that Plaintiffs' "pending motion to strike

[defendant's] answer to the complaint will be denied as moot."), aff'd, 388 F. App'x 82 (3d Cir. 2010).[5]

## V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment will be granted in part and denied in part; Plaintiffs' motion for summary judgment will be granted in part and denied in part; and Plaintiffs' motion to strike the pleadings will be dismissed as moot. A separate Order shall issue.

Robert D. Mariani
United States District Judge

---

[5] In any event, the Court notes that "striking a pleading is a drastic remedy to be used sparingly because of the difficulty of deciding a case without a factual record." Wirt v. Bon-Ton Stores, Inc., 134 F. Supp. 3d 852, 857 (M.D. Pa. 2015) (quoting Dann v. Lincoln Nat. Corp., 274 F.R.D. 139, 142-43 (E.D. Pa. 2011)). Such motions "are not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues." Wilson v. King, 2010 WL 678102, at *2 (E.D. Pa. Feb. 24, 2010) (quoting Dann, 274 F.R.D. at 142–43). Plaintiffs have not pointed to any real prejudice resulting from Defendants' untimely answer, given that the parties apparently understood the legal and factual issues of the case sufficiently to file cross-motions for summary judgment before the answer was filed.